387 F.3d 1030
 Timothy Charles PARLE, Petitioner-Appellee,
v.
David L. RUNNELS, in his capacity as Warden of the High Desert State Prison, in Susanville, Respondent-Appellant.
Timothy Charles Parle, Petitioner-Appellant,
v.
David L. Runnels, in his capacity as Warden of the High Desert State Prison, in Susanville, Respondent-Appellee.
 No. 02-16896.
 No. 02-17281.
 United States Court of Appeals, Ninth Circuit.
 Argued and Submitted August 15, 2003.
 Filed November 1, 2004.
 
 COPYRIGHT MATERIAL OMITTED Martin Nebrida Buchanan, San Diego, CA, and Michael Kresser, Santa Clara, CA, for the petitioner-appellee/cross-appellant.
 Bruce Ortega, Deputy Attorney General, San Francisco, CA, for the respondent-appellant/cross-appellee.
 Appeal from the United States District Court for the Northern District of California; William H. Alsup, District Judge, Presiding. D.C. No. CR-01-03487-WHA.
 Before: HALL, O'SCANNLAIN, Circuit Judges, and BEISTLINE, District Judge.*
 HALL, Circuit Judge.
 
 
 1
 David L. Runnels, Warden of the High Desert State Prison, appeals an order of the district court granting a writ of habeas corpus to Timothy Charles Parle, a prisoner in his custody who was convicted of murder in the first degree.[1] The district court held that the California Court of Appeal unreasonably applied Supreme Court precedent regarding the Confrontation Clause of the Sixth Amendment, and that the cumulative prejudicial effect of errors at trial deprived petitioner of a fair trial in violation of the Due Process Clause of the Fourteenth Amendment. Petitioner cross-appeals an additional holding: that his constitutional right to testify was not violated.
 
 
 2
 We exercise jurisdiction under 28 U.S.C. §§ 2241 and 2253. We REVERSE the district court, VACATE its order of relief, and REMAND for further proceedings on petitioner's cumulative error claim. We hold that the district court did not accord appropriate deference to the state courts when it found their conclusions unreasonable. Regarding petitioner's cross appeal, we conclude that, even assuming that the arbitrary restrictions placed on petitioner's testimony effectively denied him his right to testify on his own behalf, any such error did not have a substantial and injurious effect on the verdict.
 
 FACTS
 
 3
 Petitioner killed his wife, Mary Parle, on December 17, 1993. In the midst of a physical struggle between the couple, he stabbed her in the back while their 6-year-old son, Christopher, was in the house. It is not clear if Christopher actually saw the killing. An autopsy revealed that the fatal knife wound extended five inches into Mary's back, severing her pulmonary artery. Mary had fresh abrasions, contusions, and marks on her body. Contusions on her neck and marks on her forearm resembled finger pressure marks. A superficial wound on her left hand was caused by a sharp object. Two areas of hemorrhaging on her head indicated trauma.
 
 
 4
 After stabbing Mary to death, petitioner called 9-1-1 twice, but hung up each time. The operator called back, and petitioner said that Mary had "stabbed herself in the back." Shortly after being taken into custody, petitioner admitted to the police that he stabbed Mary. His story changed several times during his initial interview with the police. First he said that Mary had come after him with the knife. Then he said that he may have picked up the knife when he wrapped his hand around Mary. Finally he said:
 
 
 5
 You're right. I went over. I took the butcher's block. I found the biggest one.... I fuckin' took that fucker and set it right in her back, that's what I did. I was sick of it. I was tired of getting threatened. I'm tired of living in fear.
 
 
 6
 By all accounts petitioner and his wife had a stormy relationship. They had a history of abusing each other physically. Neither spouse appeared to be emotionally stable. Each was taking a variety of psychiatric medications and regularly drinking large amounts of alcohol. Each had been previously arrested as a result of abusive incidents.
 
 
 7
 At trial petitioner testified that what he had told the police was "99 percent" lies. He said that after he arrived home on December 17, 1993, he began to argue with Mary because some of his guns were missing and "she said she was going to blow my fucking head off." They yelled at each other about credit card bills. The argument soon turned physical with both petitioner and Mary shoving each other. Later that night, petitioner saw Mary holding a knife over Christopher's bed. He grabbed her. Mary said she was going to kill Christopher. The two moved into the kitchen. Mary hit petitioner over the head with a frying pan. He fled to the bedroom. Mary grabbed a knife from the kitchen. Petitioner, returning to the kitchen, knocked the knife out of Mary's hands. He grabbed her, shook her, and tried to calm her down. Then, petitioner testified that he
 
 
 8
 produced a knife from somewhere, either from her right hand, the sink, the butcher block, the sink, the counter. And I took it in my right hand, put it up against her back, I said, Mary, stop, cool out. You're killing me, calm down. She was going just the same. I held it against her sweatshirt against her back, said do you feel this, do you feel this. And she was just insane screaming and yelling. The next thing I know the knife handle was sticking out of her back.
 
 
 9
 He "really wasn't sure what was happening and what was not happening."
 
 
 10
 Petitioner attempted to testify about various threats Mary had made in the past, but was prevented from doing so because the trial court erroneously sustained repeated hearsay objections made by the prosecution. See infra section IIA.
 
 
 11
 At trial, the prosecution was permitted to introduce a diary Mary began keeping in the months before she was killed. See infra section IA.
 
 
 12
 Petitioner was convicted of first-degree murder following a jury trial. The California Court of Appeal found that the trial court committed numerous errors but affirmed the conviction, holding that the errors were harmless. The federal district court granted petitioner a writ of habeas corpus. The state of California timely filed a notice of appeal to this court. Petitioner cross-appealed after the district court granted a certificate of appealability on the issue of whether he was denied his rights to present a defense and testify on his own behalf.
 
 STANDARD OF REVIEW
 
 13
 We review de novo a district court's order granting a writ of habeas corpus. Kennedy v. Lockyer, 379 F.3d 1041, 1046 (9th Cir.2004). A federal court may grant a writ of habeas corpus to a state prisoner with respect to claims that were adjudicated on the merits in state court only if the state court's decision was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or if the ruling was "based on an unreasonable determination of the facts in light of the evidence presented." 28 U.S.C. § 2254(d).
 
 
 14
 A state court decision is "contrary to" clearly established federal law if the state court "applies a rule that contradicts the governing law set forth in [Supreme Court] cases" or if it "confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a result different from [Supreme Court] precedent." Early v. Packer, 537 U.S. 3, 8, 123 S.Ct. 362, 154 L.Ed.2d 263 (2002) (per curiam) (quoting Williams v. Taylor, 529 U.S. 362, 405-06, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000)). A state court decision involves an "unreasonable application of" clearly established federal law if the state court identifies the correct governing legal principle from the decisions of the Supreme Court but applies it to the particular facts of a prisoner's case in an "objectively unreasonable" manner, such that the state court decision is "more than incorrect or erroneous." Lockyer v. Andrade, 538 U.S. 63, 75, 123 S.Ct. 1166, 155 L.Ed.2d 144 (2003).
 
 
 15
 In addition, even if a state court decision is "contrary to" or "involved an unreasonable application of" clearly established federal law, we may grant relief only if petitioner shows that the error had a "substantial or injurious effect" on the verdict. Brecht v. Abrahamson, 507 U.S. 619, 637-38, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993).
 
 DISCUSSION
 
 16
 The state appeals the district court's order granting a writ of habeas corpus. Petitioner urges us to affirm the district court's grant of relief on the grounds specified in its opinion. Alternatively, petitioner cross-appeals the district court's conclusion that his right to testify on his own behalf was not violated.
 
 
 17
 The district court granted the writ of habeas corpus on two alternative grounds. First, it granted relief on the ground that the admission into evidence of Mary Parle's diary entries was an unreasonable application of Supreme Court law regarding the Confrontation Clause. Second, the district court granted relief on petitioner's cumulative error claim, partly in light of the analysis of the Confrontation Clause claim. The court held that cumulative prejudicial effect of two state evidentiary errors, together with the perceived Confrontation Clause violation, justified granting the writ. See Parle v. Runnels, 2002 WL 2012639 (N.D.Cal., 2002).[2]
 
 
 18
 We disagree with the Confrontation Clause holding. We express no opinion on whether petitioner's constitutional right to testify was violated, or whether his constitutional right to a fair trial was violated as a result of the combined effect of trial error. We deny petitioner's cross appeal on the basis of our harmless error analysis. See infra section IIB.
 
 
 19
 It is unclear whether the district court would have held that the cumulative prejudicial effect of the errors resulted in a constitutional violation if it had viewed the diary's admission into evidence as constitutionally permissible. On remand this question should be addressed.
 
 I. Confrontation Clause
 
 20
 The district court held that allowing the jury to hear evidence of Mary's diary entries violated clearly established Supreme Court law regarding the Confrontation Clause of the Sixth Amendment. We disagree.
 
 A. The diary entries
 
 21
 Mary's diary contained entries from October 3, October 8, October 16, and an undated entry between the 16th and 23rd, October 23, October 25, October 28, a November entry with no specific date, and a final entry on November 25, about three weeks before her death.[3]
 
 
 22
 Many of the entries portray Mary and petitioner's violent relationship. The October 3 entry concerns a tumultuous weekend of fighting, both verbal and physical, between Mary and petitioner. The fight started after Mary decided to go "snooping" through petitioner's belongings. Among other things, she found several pieces of women's lingerie, "dirty books," and receipts from pornography stores. Mary devised a plan to provoke petitioner deliberately by laying these items out on the coffee table so he could see them when he returned home from work. She then poured two glasses of champagne. Petitioner, returning home to this spectacle, accosted Mary and began to choke her. When they were done fighting, Mary told petitioner to go to the store to get some "drink" and some "smokes." When he returned, she cooked him dinner.
 
 
 23
 The weekend continued in similar fashion. Mary took petitioner's guns and provoked his anger. Mary rifled through his belongings and confronted him about other things. He abused her, and she abused him back. At one point, Mary took a letter opener and stabbed petitioner several times in the arm. She described him as "bleeding like a stuck pig." On Saturday, petitioner refused to eat the dinner Mary had prepared. Mary became upset. She writes that she "hit and hit and ... slapped him once good across the face."
 
 
 24
 Other entries describe physical and verbal abuse by petitioner. An October 16 entry details how petitioner complained about Mary's physical appearance. The final entry of November 25 gives an account of a particularly intense confrontation between petitioner and Mary. The ensuing fight proceeded along much the same lines as the fight described in the first entry. Petitioner and Mary both hit each other. The fight lasted an hour. Mary describes the beating she took as particularly harsh. Petitioner kneed her in the stomach, twisted her arm, and at one point pulled out his gun and jabbed it into her stomach.
 
 
 25
 Physical abuse does not appear in many of Mary's other entries. An October 15 entry recounts how petitioner is finally letting her get things she has needed for some time. The entry also admits to her own lying during the October 3 argument—despite her denials at the time, she had bought some of the lingerie that provoked their violent argument. Another entry reads as a love letter to petitioner. Other entries speak of her love for petitioner and her desire to work things out. Several entries confess to sexual problems that she and petitioner are having.
 
 
 26
 Most of the diary concerns aspects of Mary's life unrelated to her marriage. Much of it is simply about mundane details of Mary's life. For example, she writes about a conversation with the "water-man" about plumbing problems and explains how she planned to redecorate her house. Several of Mary's entries deal with her father's health problems and Christopher's medication regime for his ADHD.
 
 
 27
 Some entries are cryptic. An entry on October 25 reads, "lots to relate about Sat. 23rd but not now later." On October 28, Mary writes,
 
 
 28
 I've been in a weird state of body and mind today. ... I have not been taking my Prozac right, haven't been eating right and smoking too much—all combined maybe the problem but there is also something; something else bothering me.
 
 
 29
 The most powerful entry is probably the last one. In several emotion-filled pages, Mary expresses a desperate desire to leave her relationship with petitioner. She worries that he is going to put her in jail or an institution, as he had before. Petitioner could then get custody of their son and put him in a home somewhere.... [K]illing us wouldn't work, it would jeopardize his freedom so he feels he can force us to leave.... [H]e can never make up how he makes me feel about myself ... I have to get away from him ... to heal myself, to loose weight, to get control of my sanity, to keep from being a punching ball anymore.... It wasn't the booze that was allowing him to hit me + take his frustration and anger out on me—it just gave him a good excuse. His warped mind + screwed up morals makes him be the beast that he is.
 
 
 30
 The diary ends: "What! What! What!!"
 
 B. Confrontation Clause analysis
 
 31
 The Confrontation Clause, which applies to the states through its incorporation in the Due Process Clause of the Fourteenth Amendment, see Pointer v. Texas, 380 U.S. 400, 403, 85 S.Ct. 1065, 13 L.Ed.2d 923 (1965), mandates that "[i]n all criminal prosecutions, the accused shall enjoy the right... to be confronted with the witnesses against him." U.S. Const. amend. VI. After we heard oral argument in this case, the Supreme Court reconfigured Confrontation Clause jurisprudence in Crawford v. Washington, ___ U.S. ___, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004). The Court held that an out-of-court testimonial statement may not be admitted against a criminal defendant unless the declarant is unavailable and the defendant had a prior opportunity to cross-examine the declarant. Id. at 1374. Even as it restricted the constitutionally permissible use of testimonial hearsay in criminal cases, the Court stated that "[w]here nontestimonial hearsay is at issue, it is wholly consistent with the Framers' design to afford the States flexibility in their development of hearsay law—as does [Ohio v. Roberts, 448 U.S. 56, 100 S.Ct. 2531, 65 L.Ed.2d 597 (1980)], and as would an approach that exempted such statements from Confrontation Clause scrutiny altogether." Crawford, 124 S.Ct. at 1374 (emphasis added).
 
 
 32
 We need not decide here whether Crawford applies retroactively. Because the out-of-court statements in question were not testimonial, they are not subject to the new Crawford rule. In supplemental briefing, petitioner conceded that the diary was not testimonial, for it was not created "under circumstances which would lead an objective witness reasonably to believe that [it] would be available for use at a later trial." Id. at 1364; see Leavitt v. Arave, 383 F.3d 809, 830 n. 22 (9th Cir.2004).
 
 
 33
 At the time petitioner's conviction became final, Roberts and its progeny, Idaho v. Wright, 497 U.S. 805, 110 S.Ct. 3139, 111 L.Ed.2d 638 (1990), governed the admissibility of hearsay evidence in a criminal case under the Confrontation Clause. Roberts held that a hearsay statement is presumptively inadmissible against a criminal defendant unless the declarant is unavailable and the statement bears "adequate indicia of reliability"—that is, the statement falls within a "firmly rooted hearsay exception" or contains "particularized guarantees of trustworthiness." Roberts, 448 U.S. at 66, 100 S.Ct. 2531 (internal quotation marks omitted); see Wright, 497 U.S. at 815-16, 110 S.Ct. 3139.
 
 
 34
 Mary's diary entries do not fall within a "firmly rooted hearsay exception." The trial court admitted the diary pursuant to California Evidence Code § 1370, an exception to the hearsay rule passed by statute in California:
 
 
 35
 Evidence of a statement by a declarant is not made inadmissible by the hearsay rule if all of the following conditions are met:
 
 
 36
 (1) The statement purports to narrate, describe, or explain the infliction or threat of physical injury upon the declarant.
 
 
 37
 (2) The declarant is unavailable as a witness pursuant to [Cal. Evid.Code] Section 240.
 
 
 38
 (3) The statement was made at or near the time of the infliction or threat of physical injury. Evidence of statements made more than five years before the filing of the current action or proceeding shall be inadmissible under this section.
 
 
 39
 (4) The statement was made under circumstances that would indicate its trustworthiness.
 
 
 40
 (5) The statement was made in writing, was electronically recorded, or made to a physician, nurse, paramedic, or to a law enforcement official.
 
 
 41
 Cal. Evid.Code § 1370(a). The section lists factors which courts should take into account when ruling on whether such a hearsay statement is sufficiently trustworthy to be admitted into evidence:
 
 
 42
 ... circumstances relevant to the issue of trustworthiness include, but are not limited to, the following:
 
 
 43
 (1) Whether the statement was made in contemplation of pending or anticipated litigation in which the declarant was interested.
 
 
 44
 (2) Whether the declarant has a bias or motive for fabricating the statement, and the extent of any bias or motive.
 
 
 45
 (3) Whether the statement is corroborated by evidence other than statements that are admissible only pursuant to this section.
 
 Id. at 1370(b).[4]
 
 46
 The district court held unreasonable both the California Court of Appeal's method of analysis and its factual findings with respect to the admissibility of Mary's diary under the Confrontation Clause. We analyze these holdings in the next two sections.
 
 1. State court analysis
 
 47
 The district court detected three errors in the state court's method of analysis. First, the district court found that it was an unreasonable application of Supreme Court precedent for the Court of Appeal to have neglected to consider the utility of cross examination in ruling on the diary's admissibility. Second, the district court found that the Court of Appeal's analysis was unreasonable because it was "principally negative"—the state court appeared to assume the diary entries were trustworthy because nothing indicated they were not. Third, the district court found that the Court of Appeal unreasonably limited its analysis to the statutory factors in California Evidence Code § 1370, without considering "all" of the circumstances surrounding the creation of the diary entries. We disagree with the district court's conclusions.
 
 
 48
 First, the district court's decision rested on its erroneous view that "Supreme Court precedent required that the prosecution show the document to be `so trustworthy that adversarial testing would add little to its reliability.'" Parle, 2002 WL 2012639, at *16 (quoting Wright, 497 U.S. at 821, 110 S.Ct. 3139). The district court held the state to a strict burden, requiring it to show that cross examination of Mary would be almost useless in verifying the diary's reliability. The district court then found that "cross examination would have been an enormously useful device for challenging the damning assertions in the diary," some of which appeared to have been written under the influence of alcohol. Parle, 2002 WL 2012639, at *15.
 
 
 49
 Rather than imposing a strict requirement along these lines, Wright guided a trial court facing a Confrontation Clause objection to an out-of-court statement made by an unavailable declarant to consider as a key factor the extent to which cross examination would assist in verifying the statement's reliability. Wright held that an out-of-court statement made by an unavailable declarant is presumptively inadmissible against a criminal defendant under the Confrontation Clause, "unless an affirmative reason, arising from the circumstances in which the statement was made, provides a basis for rebutting the presumption that a hearsay statement is not worthy of reliance at trial." Id. at 821, 110 S.Ct. 3139. The hearsay statement is admissible only if it falls within "firmly rooted hearsay exception" or is supported by a showing of "particularized guarantees of trustworthiness." Id. at 816, 110 S.Ct. 3139 (quoting Roberts, 448 U.S. at 66, 100 S.Ct. 2531). Particularized guarantees of trustworthiness may be present if the totality of circumstances surrounding the statement itself—without regard to corroborating evidence separate from the statement—indicate that the statement is "so trustworthy that adversarial testing would add little to its reliability." Id. at 821, 100 S.Ct. 2531.
 
 
 50
 Our cases interpreting Wright and other relevant Confrontation Clause authority have not held the government to the high burden that the district court imposed regarding the utility of cross examination as a factor in admitting an out-of-court statement at a criminal trial. See, e.g., United States v. Aguilar, 295 F.3d 1018, 1021-23 (9th Cir.2002), cert. denied, 537 U.S. 966, 123 S.Ct. 404, 154 L.Ed.2d 325 (2002) (analyzing the reliability of guilty plea allocutions under the Confrontation Clause without mentioning the utility of cross examination); United States v. Murillo, 288 F.3d 1126, 1137-38 (9th Cir.2002) (summarizing the Confrontation Clause analysis without mentioning the utility of cross examination); Gray v. Klauser, 282 F.3d 633, 641 (9th Cir.2002), vacated on other grounds, 537 U.S. 1041, 123 S.Ct. 658, 154 L.Ed.2d 512 (2002) (approving the admission of out-of-court statements under the Confrontation Clause without mentioning the utility of cross examination). We believe that the state court acted reasonably in interpreting the Confrontation Clause jurisprudence as we interpret it.
 
 
 51
 Moreover, in holding that the trial court was required to consider the utility of cross examination when it ruled on the admissibility of Mary's diary, the district court effectively imposed a mechanical test for determining the admissibility of out-of-court statements under the Confrontation Clause. Yet, the Supreme Court has specifically "decline[d] to endorse a mechanical test for determining `particularized guarantees of trustworthiness' under the Clause." Wright, 497 U.S. at 822, 110 S.Ct. 3139. Instead, "courts have considerable leeway in their consideration of appropriate factors." Id.; see Whelchel v. Washington, 232 F.3d 1197, 1204 (9th Cir.2000) ("There is no mechanical test for determining reliability nor a prescribed list of reliability elements" in the Confrontation Clause analysis).
 
 
 52
 Second, the district court criticized the state appellate court for its "principally negative" analysis. According to the district court, the Court of Appeal assumed that the diary statements were admissible because nothing proved they were not. Had the state court framed its analysis in this way, its decision would indeed have been "contrary to" Supreme Court precedent. See Wright, 497 U.S. at 821, 110 S.Ct. 3139 (hearsay evidence is presumptively inadmissible unless reliability is guaranteed by an "affirmative reason").
 
 
 53
 But the state court's analysis must be considered in the context of California Evidence Code § 1370, which provides that hearsay evidence is presumptively inadmissible unless certain affirmative conditions are satisfied. The state court found that the diary statements met § 1370's affirmative requirements that the statement be in writing and be made at or near the time of the physical abuse. Consistent with § 1370, the Court of Appeal then considered other indicia of trustworthiness. The court determined that Mary was not biased and that her diary statements were not made in contemplation of litigation, but rather were made as part of Mary's recording the everyday events of her life. We find no error in this regard.
 
 
 54
 Third, the district court incorrectly found that the Court of Appeal's analysis was limited to the factors listed in California Evidence Code § 1370. The state court viewed the statements as trustworthy in part because they "were made as part of [Mary's] regular process of recording the events of her life." Cal. Ct.App. Op. at 50. This is not a factor listed in California Evidence Code § 1370(a).
 
 
 55
 Even if the state court had, in fact, limited its analysis to the statutory factors, it would not have unreasonably misapplied clearly established federal law. The Supreme Court has "decline[d] to endorse a mechanical test for determining `particularized guarantees of trustworthiness.'" Wright, 497 U.S. at 822, 110 S.Ct. 3139. "[C]ourts have considerable leeway in their consideration of appropriate factors." Id. The district court faulted the Court of Appeal for "fail[ing] to take into account all of the circumstances surrounding" the creation of the diary entries, but we detect no error in the state court's reasoning. While the Confrontation Clause analysis looks to the "totality of circumstances," the analysis does not require a court to consider and list every factor that could possibly be relevant to a finding that an out-of-court statement is trustworthy. Id. at 820, 110 S.Ct. 3139. What the Supreme Court has "clearly established" is that the relevant circumstances in the Confrontation Clause analysis are limited to "those that surround the making of the statement and that render the declarant particularly worthy of belief." The analysis excludes "other evidence at trial that corroborates the truth of the statement." Wright, 497 U.S. at 819, 110 S.Ct. 3139. There was nothing unreasonable about the factors the Court of Appeal discussed, or the court's overall method of analysis.
 
 2. State court findings of fact
 
 56
 The nontestimonial diary of an unavailable declarant may be admitted into evidence over a Confrontation Clause objection if a close examination of the diary itself and the circumstances surrounding its creation indicates that the diary contains particularized guarantees of trustworthiness. See Taylor v. Hannigan, 1998 WL 239640, at * 7-8 (D.Kan., 1998) (admission of a murder victim's personal notebook did not violate the Confrontation Clause where the declarant did not create the notebook in anticipation of litigation and did not make "self-serving, frivolous, or scornful" declarations, and nothing in the record indicated "that the statements were made in bad faith or with any incentive to falsify or distort"); United States v. Sheets, 125 F.R.D. 172, 177-79 (D.Utah, 1989) (admission of a diary written by the defendant's deceased wife did not violate the Confrontation Clause where the declarant wrote an entry every day in her own hand, the entries did not appear to be frivolous, and "there was no reason" for the declarant "to lie to herself or make false, negative statements in her diary"); United States v. Treff, 924 F.2d 975, 982-83 (8th Cir.1991) (admission of a diary against a federal criminal defendant was not an abuse of discretion under the residual hearsay exception now codified at Federal Rule of Evidence 807; even though the declarant's attorney had advised the declarant to begin keeping the diary in anticipation of litigation, the diary contained "circumstantial guarantees of trustworthiness").
 
 
 57
 The district court held that the California Court of Appeal's findings of fact were unreasonable under 28 U.S.C. § 2254(d)(2). The district court held that the trial court's finding that Mary was not biased—a finding upheld by the Court of Appeal—was an unreasonable finding of fact because there was "every indication that Mary was biased against petitioner." Parle, 2002 WL 2012639, at *15 (emphasis in the original). Mary described petitioner as a "beast" in her diary and blamed him for ruining her life. But she did so because of the physical and mental abuse she suffered at his hands. The district court's reasoning is circular in holding that Mary's statements about petitioner's abuse are not trustworthy because Mary was biased against petitioner on account of this very abuse. To sustain the district court's analysis, we would have to hold that any victim's description of abuse is biased.
 
 
 58
 The California evidence statute does not support the district court's interpretation of bias. Section 1370 asks" [w]hether the declarant has a bias or motive for fabricating the statement, and the extent of any bias or motive." Cal. Evid.Code § 1370(b) (emphasis added).
 
 
 59
 Neither the diary itself nor the circumstances surrounding its creation suggests that Mary had a motive to fabricate descriptions of abuse in her diary. Far from being frivolous, Mary's diary reads as a very honest account of her life in the months leading up to her killing. Her tone is frank and sincere. In places she writes that she still loved petitioner and hoped things would work out with their relationship. In other places she even admits her own wrongdoing, confessing that she falsely accused, deliberately provoked, and physically abused petitioner—one time by stabbing him with a letter opener. The diary contains statements that Mary would not be likely to want anyone else to read: statements that are personally damaging and that reveal the most intimate details of her relationship with petitioner. There was nothing unreasonable about the state court's determination that Mary lacked a motive to falsify her own diary.
 
 
 60
 Petitioner argues that Mary wrote the diary in anticipation of a divorce and a possible custody dispute. Nothing in the record supports the assertion that Mary wrote the diary in order to use it later in litigation. Mary did not appear to have such a sophisticated understanding of the law of evidence. Had she lived, Mary could have testified about the abuse herself.
 
 
 61
 Finally, the district court held unreasonable the Court of Appeal's supposed finding that "diaries (in general) are inherently trustworthy because they reflect a `regular process of recording the events' of one's life." Parle, 2002 WL 2012639, at *15. But in fact, the Court of Appeal found that "Mary's diary entries were made as part of her regular process of recording the events in her life." Cal. Ct.App. Op. at 50 (emphasis added). Rather than addressing "diaries (in general)," the state court evaluated the particular circumstances surrounding the creation of Mary's diary. Mary's son testified that she had regularly kept a diary at many points during her life. While some of her entries describe petitioner's abuse of her, most of them describe other parts of her life. For example, Mary writes about her relationship with her father, his health problems, and her son's medication regime. Many entries simply recount what she did that day. It was entirely reasonable for the state court to find that Mary's diary was trustworthy because she kept it regularly and in it recorded the everyday experiences of her life. And the trial court's admission into evidence of the entire diary minimized the possibility that the jury would view certain passages outside their proper context.[5]
 
 
 62
 We conclude that the admission into evidence of Mary's diary was neither contrary to, nor involved an unreasonable application of, clearly established federal law as determined by the Supreme Court. Further, none of the factual findings made in connection with the admission of the diary entries were unreasonable. We therefore vacate the district court's grant of relief on Confrontation Clause grounds.
 
 
 63
 II. Petitioner's Cross-Appeal: The Right To Testify
 
 
 64
 The district court granted petitioner a certificate of appealability on whether the state trial court infringed upon petitioner's "Sixth and Fourteenth Amendment rights to present a defense and testify on his own behalf by repeatedly striking from the record his trial testimony regarding the victim's threats." Both the district court and the state appellate court rejected petitioner's argument that his right to testify on his own behalf was denied. Both courts also concluded that any such violation of petitioner's rights was harmless error.
 
 
 65
 For present purposes, we shall assume, without deciding, that petitioner's right to testify was violated by what the state concedes were improperly sustained hearsay objections, and that the state court's decision to the contrary constituted an objectively unreasonable application of Rock v. Arkansas, 483 U.S. 44, 52, 107 S.Ct. 2704, 97 L.Ed.2d 37 (1987). We nevertheless deny petitioner relief on his cross appeal because, as we explain below, we conclude that any error did not have a "substantial and injurious effect" on the jury verdict.
 
 A. Petitioner's trial testimony
 
 66
 At trial, defendant argued, among other things, that he killed his wife in unreasonable self-defense. California recognizes the doctrine of imperfect (or unreasonable) self-defense. If a defendant killed a human being because the defendant honestly, yet unreasonably, feared the imminent infliction of death or great bodily injury, the defendant is guilty, not of murder, but of voluntary manslaughter. Imperfect self-defense is not an affirmative defense; it negates an element of murder—malice aforethought. People v. Barton, 12 Cal.4th 186, 199-201, 47 Cal. Rptr.2d 569, 576-78, 906 P.2d 531, 538-40 (1995).
 
 
 67
 Petitioner took the stand at his trial and tried to explain why he feared his wife:
 
 
 68
 Defense Counsel: After the time that you found [the guns] to be missing, did Mary ever threaten to shoot you?
 
 
 69
 Petitioner: Yes, sir.
 
 
 70
 Defense Counsel: On how many occasions?
 
 
 71
 Petitioner: At least half a dozen.
 
 
 72
 Defense Counsel: And what would she say?
 
 
 73
 Prosecutor: Objection. Hearsay.
 
 
 74
 The Court: Sustained.
 
 
 75
 Defense Counsel: Did she threaten you within a week of her death?
 
 
 76
 Petitioner: Yes, she did.
 
 
 77
 Prosecutor: Objection. Hearsay.
 
 
 78
 The Court: Sustained.
 
 
 79
 Prosecutor: Move to strike.
 
 
 80
 The Court: Motion granted.
 
 
 81
 * * *
 
 
 82
 Petitioner: My wife Mary called me [at work on December 13th, 1993].
 
 
 83
 Defense Counsel: And what did she say?
 
 
 84
 Prosecutor: Objection. Hearsay.
 
 
 85
 The Court: Sustained.
 
 
 86
 Defense Counsel: What did she—what did she tell you during that phone call that had an effect on you?
 
 
 87
 Petitioner: This is one of the most—top five most scariest moments I was ever in, at that moment. Especially two or three hours later compounded.
 
 
 88
 Defense Counsel: And on December 17th, 1993, did you have in mind those things that she told you on December 13th?
 
 
 89
 Prosecutor: Objection. Hearsay—excuse me, leading.
 
 
 90
 The Court: Sustained.
 
 
 91
 * * *
 
 
 92
 Defense Counsel: You had a phone call at work on December 13th?
 
 
 93
 Petitioner: Yes, sir.
 
 
 94
 Defense Counsel: Did that have some impact on you and your thinking at a later date?
 
 
 95
 Petitioner: Yes, sir.
 
 
 96
 Defense Counsel: What kind of impact did it have?
 
 
 97
 Petitioner: How do I word it so it is not hearsay. There was—there was an actual—my son Christopher and my life was going to be terminated, period. You are going to die. I am going to kill you and then kill Christopher.
 
 
 98
 Prosecutor: Objection. Hearsay.
 
 
 99
 The Court: Sustained.
 
 
 100
 Prosecutor: Motion to strike.
 
 
 101
 The Court: Motion to strike granted.
 
 
 102
 * * *
 
 
 103
 Petitioner: I was scared out of my mind [on the night of the stabbing] because what was going through my mind was the phone call that previous Monday. She was going to do a drive-by shooting, kill me, and then to spite the Parle family, she was going to blow away Christopher, was still on my mind.
 
 
 104
 Prosecutor: Objection. Hearsay.
 
 
 105
 The Court: Objection will be sustained.
 
 
 106
 Defense Counsel: Your Honor, I understand this to just be his state of mind, and I would ask for that.
 
 
 107
 The Court: Objection?
 
 
 108
 Prosecutor: The objection is to what she allegedly said in the phone call was hearsay. I move to strike it for that reason.
 
 
 109
 The Court: All right. Objection will be sustained. Motion to strike is granted. Now, it's being offered for his state of mind, any objection? Prosecutor: State of mind requires a finding of reliability.
 
 
 110
 The Court: No. Just yes or no.
 
 
 111
 Prosecutor: I object under 1222.
 
 
 112
 The Court: Objection will be sustained.
 
 
 113
 * * *
 
 
 114
 Defense Counsel: Now, this fear you felt, was this as a result of things Mary had told you?
 
 
 115
 Petitioner: Yes.
 
 
 116
 Prosecutor: Objection. Foundation.
 
 
 117
 The Court: Foundation?
 
 
 118
 Prosecutor: There's been no evidence of her saying anything to him.
 
 
 119
 The Court: Sustained.
 
 
 120
 Defense Counsel: This feeling that you had that Mary was a dangerous person, was it a result of things that she had told you about her past?
 
 
 121
 Petitioner: That Monday when she called me at the store and she said she was going to kill me.
 
 
 122
 Prosecutor: Objection.
 
 
 123
 The Court: Objection sustained.
 
 
 124
 Prosecutor: Move to strike.
 
 
 125
 The Court: Motion to strike granted.
 
 
 126
 The state conceded before the California Court of Appeal that these objections were improperly sustained. The testimony was not hearsay, as it was not offered to prove the truth of the matter asserted, but rather to show that petitioner honestly but unreasonably feared imminent death or great bodily injury. See Cal. Evid.Code § 1250. There can be no serious dispute that by sustaining the prosecutor's objections, the trial court substantially restricted petitioner's ability "to present his own version of events in his own words." Rock, 483 U.S. at 52, 107 S.Ct. 2704.
 
 B. Harmless error under Brecht
 
 127
 Even if a state court decision is "contrary to" or "involved an unreasonable application of" clearly established federal law, a habeas court may grant relief only if petitioner shows that the error had a "substantial or injurious effect" on the verdict. Brecht, 507 U.S. at 637-38, 113 S.Ct. 1710. If a habeas court is left with "grave doubt" about whether a constitutional error substantially influenced the verdict, then the error was not harmless. O'Neal v. McAninch, 513 U.S. 432, 438, 115 S.Ct. 992, 130 L.Ed.2d 947 (1995). Here, even assuming that the state court unreasonably misapplied Rock to petitioner's claim, we hold that any such error did not substantially influence the verdict.
 
 
 128
 Since petitioner admitted that he killed his wife, the primary issue at trial was his intent. On this issue the prosecution had overwhelming evidence. Most important was the manner in which the crime was committed. Mary was stabbed in the back. The knife extended five inches into her body, suggesting that petitioner exerted a significant amount of force when he stabbed her. Pressure marks on her forearm implied he held back her arms. Contusions on her neck and other bruises implied he beat her. All this physical evidence pointed to an intentional killing, calling into question petitioner's assertion that he had merely held the knife to her back and did not remember anything after that. Mary's diary showed that petitioner had a history of inflicting severe physical punishment on his wife. Additional evidence showed that he had previously threatened to kill Mary and several other people. Petitioner's own words to the police on the night of the killing suggested that immediately before he stabbed Mary, he considered his actions:
 
 
 129
 I went over. I took the butcher's block. I found the biggest one. That knife was about this big.... I fuckin' took that fucker and set it right in her back, that's what I did.
 
 
 130
 Although the trial court prevented petitioner from testifying about Mary's threats, the diary provided the jury with evidence that she acted violently toward petitioner, and several witnesses testified as to Mary's threats. Petitioner's father testified that, just a few weeks before her death, Mary told him that if petitioner did not "get in line, she'd shoot his ass." A police officer and another individual testified that petitioner had told them that Mary had threatened to shoot petitioner and Christopher. Petitioner himself testified about Mary's propensity toward violence. He said that several of his guns were missing on the night of the killing. He told the jury about the time when Mary punched her fist through the front door of the couple's apartment. He testified about the times when Mary confronted him in public, yelling and screaming at him in a ferocious manner. Petitioner testified that Mary beat Christopher daily during the last six months of her life. When he pressed Mary about the alleged beatings, Mary "took a swing" at him. On another occasion, Mary "sucker punched" him in front of his parents.
 
 
 131
 Despite all this evidence of Mary's violent character, the jury rejected petitioner's defense and found him guilty of first-degree murder. We have no "grave doubt" regarding whether the jury would have rendered a different verdict if it had heard petitioner testify about Mary's threats. We conclude that the jury would still have chosen not to accept petitioner's imperfect self-defense theory. Any constitutional error in the trial court's erroneous sustainment of the prosecution's frivolous hearsay objections did not have a "substantial and injurious" effect on the verdict. We therefore do not grant relief on petitioner's cross appeal.
 
 III. Cumulative Error
 
 132
 The cumulative error doctrine in habeas recognizes that, "even if no single error were prejudicial, where there are several substantial errors, `their cumulative effect may nevertheless be so prejudicial as to require reversal.'" Killian v. Poole, 282 F.3d 1204, 1211 (9th Cir.2002) (quoting United States v. de Cruz, 82 F.3d 856, 868 (9th Cir.1996)). In the absence of a specific constitutional violation, habeas review of trial error is limited to whether the error "so infected the trial with unfairness as to make the resulting conviction a denial of due process." Donnelly v. DeChristoforo, 416 U.S. 637, 643, 94 S.Ct. 1868, 40 L.Ed.2d 431 (1974). A habeas court may not grant the writ on the basis of errors of state law whose combined effect does not violate the Federal Constitution. Lewis v. Jeffers, 497 U.S. 764, 780, 110 S.Ct. 3092, 111 L.Ed.2d 606 (1990); Pulley v. Harris, 465 U.S. 37, 41, 104 S.Ct. 871, 79 L.Ed.2d 29 (1984).
 
 
 133
 The district court ruled that the evidentiary errors at trial deprived petitioner of a fair trial in violation of the Due Process Clause of the Fourteenth Amendment. The state did not appeal the district court's grant of relief on this basis. Instead, it requested that we remand the case to the district court with instructions to reevaluate the cumulative prejudicial effect of the errors independent from the Confrontation Clause issue. We grant the state's request.
 
 
 134
 Accordingly, we remand to the district court for further consideration of the cumulative error claim in light of our holding that the admission of Mary Parle's diaries did not violate petitioner's Confrontation Clause rights. On remand, the district court may consider and aggregate any errors of federal and state law in connection with its cumulative error analysis, but only to the extent that the errors relate to the issue of whether petitioner was denied a fair trial.
 
 CONCLUSION
 
 135
 We REVERSE the district court's grant of relief on the Confrontation Clause claim, AFFIRM the district court's denial of relief on petitioner's claim that his constitutional right to testify was violated, and REMAND for further proceedings on petitioner's claim that his constitutional right to a fair trial was violated.
 
 
 136
 The district court's order granting a writ of habeas corpus is VACATED.
 
 
 
 Notes:
 
 
 *
 The Honorable Ralph R. Beistline, United States District Judge for the District of Alaska, sitting by designation
 
 
 [1]
 This opinion refers to the appellant/cross-appellee as "the state." It refers to Timothy Charles Parle as "petitioner" in order to avoid confusion with Mary Parle, the victim, and Christopher Parle, the child of petitioner and Mary Parle
 
 
 [2]
 The two errors that the district court identified were the trial court's rulings restricting the testimony of petitioner and his expert witness
 
 
 [3]
 After the trial court indicated that it would allow in the October 3 entry, petitioner's attorney asked that the entire diary be admitted into evidence so that the jury could evaluate the diary in its entirety. The court then admitted the entire diary. The parties agree that petitioner has not waived his objections to the admission of the diary entries
 
 
 [4]
 The Supreme Court's Confrontation Clause jurisprudence has rejected the third factorSee Wright, 497 U.S. at 822-23, 110 S.Ct. 3139; People v. Hernandez, 71 Cal.App.4th 417, 423-24, 83 Cal.Rptr.2d 747, 752 (1999) ("While ... under [Wright], corroboration by other evidence is not a legitimate component of trustworthiness, its presence in Evidence Code section 1370 does not render the statute unconstitutional because the section still requires the essential indicia of trustworthiness and it suggests other legitimate factors which may establish that.").
 
 
 [5]
 For an argument that the diaries of battered women are inherently reliable, see Lenora Ledwon,Diaries and Hearsay: Gender, Self-hood and the Trustworthiness of the Narrative Structure, 73 Temple L.Rev. 1185 (2000) (arguing that because diaries of battered women who are murdered often contain reliable statements made by women who possess no other means to communicate, these diaries should generally be admissible in court, but that judges often exclude them under the influence of gender stereotypes).