Volume 1 of 2

**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

| | |
|---|---|
| MARVIN HOWARD BOCKTING, *Petitioner-Appellant,* v. ROBERT BAYER, *Respondent-Appellee.* | No. 02-15866 D.C. No. CV-98-00764-ECR ORDER AND AMENDED OPINION |

Appeal from the United States District Court
for the District of Nevada
Edward C. Reed, District Judge, Presiding

Argued and Submitted
January 14, 2004—San Francisco, California

Filed February 22, 2005
Amended June 1, 2005

Before: J. Clifford Wallace, John T. Noonan, and
M. Margaret McKeown, Circuit Judges.

Opinion by Judge McKeown;
Concurrence by Judge Noonan;
Partial Concurrence and Partial Dissent by Judge Wallace

**COUNSEL**

Franny A. Forsman, Federal Public Defender, Las Vegas, Nevada, for the appellant.

Victor-Hugo Schulze II, Deputy Attorney General, Las Vegas, Nevada; Rene L. Hulse, Deputy Attorney General, Las Vegas, Nevada, for the appellee.

**ORDER**

The opinion filed February 22, 2005, slip op. 1991, and appearing at 399 F.3d 1010 (9th Cir. 2005), is amended as follows:

At 399 F.3d 1022, slip op. 2012, strike the last paragraph of Part II. Substitute the following paragraph:

The final question is whether admission of Autumn's statement "had substantial and injurious effect or

influence in determining the jury's verdict." *See Brecht v. Abrahamson*, 507 U.S. 619, 623 (1993). The detective's testimony regarding Autumn's interview was a critical piece of evidence, particularly in view of Autumn's inconsistent testimony at the preliminary hearing, and weaknesses in Laura Bockting's testimony. Even if Autumn's statement to the mother was, for argument's sake, considered admissible, the detective's description of Autumn's interview was so significant as corroborating evidence that its admission had a substantial and injurious effect or influence in determining the jury's verdict. Thus, the admission of Autumn's statement requires reversal.

The petition for panel rehearing is DENIED. The petition for rehearing en banc is pending before the Court. No further petitions may be filed.

---

## OPINION

McKEOWN, Circuit Judge:

Marvin Bockting's conviction for sexual abuse and life sentences stem from a trial in which the only witness to the conduct, his six-year old stepdaughter, Autumn Bockting, did not testify at trial, but whose interview with a detective was admitted as key evidence. Autumn's statements at the interview contradicted her testimony at a preliminary hearing where she claimed not to remember what happened with her father. Admission of the interview evidence without cross-examination violated Bockting's constitutional right "to be confronted with the witnesses against him." U.S. Const. amend. VI.

Although this case has been before the Nevada Supreme Court twice and before the United States Supreme Court on

one occasion, resolution now rests on interpretation of an intervening Supreme Court case: *Crawford v. Washington*, 541 U.S. 36, 124 S. Ct. 1354 (2004). In *Crawford*, the Court definitively held that "[t]estimonial statements of witnesses absent from trial have been admitted only where the declarant is unavailable and only where the defendant has had a prior opportunity to cross-examine." 124 S. Ct. at 1369. Because the little girl's testimony, which was not subject to cross-examination, was central to the conviction, its admission can hardly be classified as harmless error. *Crawford* dictates reversal.

The thorny issue is whether *Crawford* applies retroactively to this state habeas appeal. In an earlier case, we reserved this question for future consideration. *See Leavitt v. Arave*, 383 F.3d 809, 830 n.22 (9th Cir. 2004) (per curiam). If, as Judge Noonan argues, *Crawford* simply reiterates a longstanding rule and does not announce a new rule, then retroactivity falls out of our analysis. If, on the other hand, *Crawford* is characterized as a "new rule," then we are faced with analyzing the retroactivity of *Crawford* in the framework of yet another recent Supreme Court case, *Schriro v. Summerlin*, ___ U.S. ___, 124 S. Ct. 2519 (2004). New rules apply retroactively only where they place "certain kinds of primary, private individual conduct beyond the power of the criminal law-making authority to proscribe," or where the new rule is "implicit in the concept of ordered liberty." *Teague v. Lane*, 489 U.S. 288, 307 (1989). The latter category is "reserved for watershed rules of criminal procedure." *Id.* at 311.

The threshold question is whether *Crawford* constitutes a "new rule" under *Teague*. Judge Noonan's approach—namely that *Crawford* does not announce a new rule but rather is a "correction of a misinterpretation," Concurrence at 5902—has a certain appeal in light of the Court's historical emphasis in *Crawford*. Indeed, one can read *Crawford* as intimating that the rule is longstanding. Unfortunately, Justice Scalia's analysis is not entirely consistent with that viewpoint. None-

theless, characterizing *Crawford* as something less than a new rule, as Judge Noonan does, is one legitimate way of interpreting *Crawford*. To do so leads to the same result here—the application of *Crawford* to Bockting's pending habeas claims.

Despite the appeal of Judge Noonan's reasoning, application of the Supreme Court's guidance in *Teague* leads to the conclusion that *Crawford* announces a "new rule." Because the *Crawford* rule is both a "watershed rule" and one "without which the likelihood of an accurate conviction is *seriously* diminished," *Summerlin*, 124 S. Ct. at 2523, the rule is retroactive.

## I. FACTUAL BACKGROUND

Marvin Bockting lived with his wife, Laura, and his two daughters, Autumn and Honesty, in a motel in Las Vegas. Autumn had taken showers together with Laura and Bockting. She had also seen them having sex, and she was accustomed to the use of sexual language.

One Saturday night, when Laura was at home alone with the children, Autumn Bockting woke up crying. Her mother observed that "she looked like she had just woken up from a bad dream and she was quite upset." At first she refused to tell Laura what was wrong. Laura asked why she wouldn't tell. Autumn told her, "Because daddy said that you would make him leave and that he would beat my butt if I told you." After reassurance from her mother, Autumn said "daddy put his pee-pee in her pee-pee, and that daddy put his pee-pee in her butt, and daddy made her suck on his pee-pee like it was a sucker."

The next day, Laura confronted Bockting. She asked him to leave, which he did. Two days later, a Tuesday, Laura called the rape crisis hotline and was told to take Autumn to the hospital, where they were met by Detective Zinovitch. Zinovitch tried to interview Autumn, but she was too upset.

A rape examination was performed. The doctor found that Autum's rectal sphincter had been torn within the past week. She also found that Autumn's hymenal ring was wide open, a rarity in a six-year old. The doctor determined that although she "couldn't determine what kind of instrument or foreign body was used to cause the laxness of the hymen and the fissure of the rectum," it had been caused by a blunt force. Two days later, Autumn was again interviewed by a detective. She repeated what she had told her mother, accurately describing the positions of the sex acts. She also demonstrated the acts with anatomically correct dolls.

At Bockting's preliminary hearing, Autumn was able to answer questions about the difference between the truth and a lie, but became upset when she was asked about being touched by Bockting. Upon further questioning, she said she could not remember what occurred with her father and did not remember whether she had talked with the detective about the claimed assault. The judge declared Autumn an unavailable witness, and the preliminary hearing proceeded with the testimony of Laura and Zinovitch. At trial, the judge found that Autumn's hearsay statements were admissible because she was effectively unavailable for trial. Without having the opportunity to cross-examine Autumn, Bockting was convicted and sentenced to life in prison.

Bockting appealed to the Nevada Supreme Court, which dismissed his claims. The United States Supreme Court later vacated the Nevada Supreme Court's decision, remanding for consideration in light of *Idaho v. Wright*, 497 U.S. 805 (1990). In 1993, the Nevada Supreme Court affirmed Bockting's conviction. He filed a second petition for post-conviction relief, which the state district court denied in 1994. Three years later, the Nevada Supreme Court again dismissed the appeal. Bockting then sought relief in federal court. He timely filed a habeas petition in 1998, which he amended in 2000. The district court denied the petition, and Bockting filed the present appeal.

## II. DISCUSSION

Because Bockting filed his petition after the effective date of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), its provisions apply. *See Woodford v. Garceau*, 538 U.S. 202, 207 (2003). Under AEDPA, habeas relief to a state prisoner is available only if the state court's decision "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or was "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(1)-(2).

The Supreme Court also directs us that "in addition to performing any analysis required by AEDPA, a federal court considering a habeas petition must conduct a threshold *Teague* analysis when the issue is properly raised by the state." *See Horn v. Banks*, 536 U.S. 266, 272 (2002). Indeed, as the Court noted, "if our post-AEDPA cases suggest anything about AEDPA's relationship to *Teague*, it is that the AEDPA and *Teague* inquiries are distinct." *Id.*

**[1]** In explaining *Teague*'s application, the Supreme Court recently explained that there are three steps to determining whether a rule of criminal procedure applies on collateral review:

> First, the court must determine when the defendant's conviction became final. Second, it must ascertain the legal landscape as it then existed, and ask whether the Constitution, as interpreted by precedent then existing, compels the rule. That is, the court must decide whether the rule is actually "new." Finally, if the rule is new, the court must consider whether it falls within either of the two exceptions to nonretroactivity.

*Beard v. Banks*, 124 S. Ct. 2504, 2510 (2004) (internal citations omitted). Because Bockting's conviction became final in 1993, we must evaluate whether any subsequent rule of constitutional law is new against the benchmark of that year.

### A.  *CRAWFORD* ANNOUNCED A NEW RULE

The question before us is whether the Confrontation Clause principles stated in *Crawford* amount to a new rule. In *Crawford*, the Supreme Court considered whether Washington State's use at trial of a witness's tape-recorded statement to a police officer violated the Confrontation Clause. 124 S. Ct. at 1357. Writing for the Court, Justice Scalia engaged in a lengthy historical analysis of the Confrontation Clause, noting that "the principal evil at which the Confrontation Clause was directed was the *civil-law mode of criminal procedure*, and particularly its use of *ex parte* examinations as evidence against the accused." *Id.* at 1363 (emphasis added). He went on to emphasize "that the Framers would not have allowed admission of testimonial statements of a witness who did not appear at trial unless he was unavailable to testify, *and* the defendant had had a prior opportunity for cross-examination." *Id.* at 1365 (emphasis added).

**[2]** Whether the rule in *Crawford* is new depends on whether it "was *dictated* by the then-existing precedent." *Beard*, 124 S. Ct. at 2511. To be sure, the majority in *Crawford* is somewhat opaque as to the categorization of its ultimate holding. As the Court noted, "[a]lthough the results of our decisions have generally been faithful to the original meaning of the Confrontation Clause, the same cannot be said of our rationales." 124 S. Ct. at 1369. The puzzler is whether the "results of [the Supreme Court] decisions" are coextensive with the rules of those decisions. If so, then the *Crawford* pronouncement could be legitimately viewed as a continuation of Supreme Court jurisprudence. Careful scrutiny of the *Crawford* opinion suggests otherwise for at least two reasons: (1) *Crawford* deviates from the test announced in *Ohio v. Rob-*

*erts*, 448 U.S. 56 (1980); and (2) simply reaching the right "result" does not mean that the result flowed from a constant rule.

As the Court observed, "*Roberts* conditions the admissibility of all hearsay evidence on whether it falls under a 'firmly rooted hearsay exception' or bears particularized guarantees of trustworthiness." *Crawford*, 124 S. Ct. at 1369 (quoting *Roberts*, 448 U.S. at 66). *Roberts* rests on evidentiary principles of reliability and trustworthiness rather than on the constitutional principle of confrontation.

The *Crawford* majority quite clearly states that the *Roberts* "test departs from the historical principles" in that it is both "too broad" and "too narrow." *Crawford*, 124 S. Ct. at 1369. *Crawford* did not announce the same rule as *Roberts*. Whereas *Roberts* countenanced the admission of witness testimony if trustworthy, under *Crawford* the testimony is admitted only if the witnesses are subject to cross-examination. The Court concluded that the cases applying *Roberts* have "remained faithful to the Framers' understanding," *id.* at 1369, that testimonial statements are admissible only when two criteria are met: unavailability and opportunity for cross-examination. In other words, "[w]here testimonial statements are at issue, the only indicium of reliability sufficient to satisfy constitutional demands is the one the Constitution actually prescribes: confrontation." *Id.* at 1374. Although historical principles are the bedrock for the *Crawford* decision, getting back to the bedrock required the Court to disavow the *Roberts* test. The dissent in *Crawford* mirrors this view by concluding that "the Court of course overrules *Ohio v. Roberts*," *id.* at 1378, and criticizing the "Court's adoption of a new interpretation of the Confrontation Clause. . . . ," *id.* at 1374.

To say that the outcomes or "results" have been generally "faithful to the original meaning" is not the same as saying that there has been a consistent rule throughout our history.

Indeed, the *result* in an individual case may well be consistent with the Supreme Court's new interpretation of *Crawford*, but that does not mean that the rule that dictated the prior result is necessarily consistent with *Crawford*. The majority in fact underscores the dichotomy between outcomes and rules in announcing that, "[i]f nothing else, the test we announce is an empirically accurate explanation of the results our cases have reached." *Id.* at 1369 n.9. Rules and outcomes are neither the same nor wholly overlapping.

Finally, the Court in *Crawford* pinpointed a situation that was, in fact, "arguably in tension with the rule requiring a prior opportunity for cross-examination when the proffered statement is testimonial." *Id.* at 1368 n.8. Citing *White v. Illinois*, 502 U.S. 346 (1992), the Court described a case remarkably similar to ours, in which "statements of a child victim to an investigating police officer [were] admitted as spontaneous declarations." *Id. White* rested on the issue of the unavailability requirement under the Confrontation Clause; had *Crawford* been the rule at the time, the lack of cross-examination would have been fatal to the admission of the evidence.

**[3]** Although the long line of Confrontation Clause cases is "faithful to the original meaning" of the clause, *id.* at 1369, we cannot overlook *Roberts* and *White*. On balance, an analysis of the historical application of the Confrontation Clause cases leads to the conclusion that *Crawford* announces a new rule that must be put through the *Summerlin* strainer. If, on the other hand, *Crawford* does not announce a new rule—the position taken by Judge Noonan—then the *Summerlin* analysis is not required. Either way, the result in this case is the same. Bockting's petition should be granted.

## B.  *SUMMERLIN*  CONTROLS THE RETROACTIVITY ANALYSIS

Because *Crawford* announces a new rule, we must ask whether it falls into one of the two *Teague* exceptions to the bar on retroactivity. The first *Teague* exception is for primary

conduct that cannot be criminalized. The second is for bedrock rules of criminal procedure. *Teague*, 489 U.S. at 307. It is the second exception that is at play in this case.

**[4]** The *Crawford* rule does not narrow the scope of a criminal statute by interpreting its terms, nor is it a constitutional determination that places particular conduct or persons covered by the statute beyond the State's power to punish. *Summerlin*, 124 S. Ct. at 2522. Rather, the rule in *Crawford* is procedural. *See also Crawford*, 124 S. Ct. at 1370 (stating the Confrontation Clause provides "a procedural rather than a substantive guarantee"). Therefore, *Crawford* merits retroactive application only if it implicates "the fundamental fairness and accuracy of the criminal proceeding," *Saffle v. Parks*, 494 U.S. 484, 495 (1990), and reworks our understanding of bedrock criminal procedure, *Sawyer v. Smith*, 497 U.S. 227, 242 (1990).

**[5]** To be sure, under *Summerlin*, the lower courts are tightly constrained in determining whether a new rule is a "watershed rule" that is not only fundamental, but one "without which the likelihood of an accurate conviction is seriously diminished." *Summerlin*, 124 S. Ct. at 2523 (quoting *Teague*, 489 U.S. at 313). Viewing *Crawford* and *Summerlin* together poses a conundrum. Justice Scalia wrote for the majority in both cases. In *Summerlin*, the Court admonished that "[t]his class of [retroactive] rules is extremely narrow, and it is unlikely that any . . . ha[s] yet to emerge." 124 S. Ct. at 2523 (quoting *Tyler v. Cain*, 533 U.S. 656, 667 n.7 (2001)) (internal quotations omitted). Nonetheless, the bar is not absolute and the *Crawford* rule meets the Court's criteria. Admonitions such as in *Summerlin* offer discouragement but no guidance. Because our job is not to conjure up hidden meaning, we simply heed the warning and our analysis thus adheres faithfully to the holding and rationale of *Summerlin*. Viewing *Crawford* in light of *Summerlin* leads to the conclusion that the *Crawford* cross-examination requirement merits retroactive application.

That the *Crawford* requirement is fundamental to our legal regime is beyond dispute. Justice Scalia's eloquent recitation of the history, purpose, and place of the Confrontation Clause and cross-examination answers this question. *Crawford*, 124 S. Ct. at 1359. Hundreds of years of tradition have embedded this notion as a fundamental role. Indeed, "[t]he Framers would be astounded to learn that *ex parte* testimony could be admitted against a criminal defendant because it was elicited by 'neutral' government officers." *Id.* at 1373.

The question next posed is whether the rule implicates the accuracy of the criminal proceeding. Juxtaposed, *Summerlin* actually underscores why the *Crawford* rule implicates the "fundamental fairness and accuracy of the criminal proceeding," *Saffle*, 494 U.S. at 495, and alters our understanding of bedrock procedural principles, whereas the sentencing scheme in *Summerlin* did not. In *Summerlin*, the Court concluded that *Ring v. Arizona*, 536 U.S. 584 (2002), which held that aggravating factors in a death penalty case must be proved to a jury rather than to a judge, was not a retroactive rule. *Summerlin* asked "whether judicial factfinding so *seriously* diminishe[s] accuracy that there is an impermissibly large risk of punishing conduct the law does not reach." *Summerlin*, 124 S. Ct. at 2525 (citations and quotations omitted). The answer was no because "[t]he evidence is simply too equivocal to support that conclusion." *Id.*

In *Summerlin*, the Court observed that "for every argument why juries are more accurate factfinders, there is another why they are less accurate."[1] In contrast, the evidence that cross-

---

[1]The Court rejected the notion that the jury trial right seriously impacted accuracy in part because the jury-free civil law system is so prevalent: "[T]he mixed reception that the right to jury trial has been given in other countries . . . surely makes it implausible that judicial factfinding so *seriously* diminishe[s] accuracy as to produce an impermissibly large risk of injustice." 124 S. Ct. at 2525 (internal quotations omitted).

Unlike the "mixed reception that the right to jury trial has been given in other countries," *id.*, the right of confrontation is well established in

examination seriously decreases the possibility of inaccurate conviction is unequivocal.

[6] The Supreme Court has repeatedly and without deviation held that the purpose of the Confrontation Clause is to promote accuracy. *See, e.g.*, *Crawford*, 124 S. Ct. at 1370 ("This open examination of witnesses . . . is much more conducive to the clearing up of truth.") (quoting 3 Blackstone, Commentaries * 373); *White v. Illinois*, 502 U.S. 346, 355 (1992) (evaluating a Confrontation Clause claim against the benchmark of accuracy); *Tennessee v. Street*, 471 U.S. 409, 415 (1985) (describing the "Confrontation Clause's very mission" as "to advance the accuracy of the truth-determining process in criminal trials") (internal quotation omitted); *Ohio v. Roberts*, 448 U.S. 56, 65 (1980) (stating the purpose of the Confrontation Clause is to "augment accuracy in the factfinding process"); *Parker v. Randolph*, 442 U.S. 62, 73 (1979) (plurality) ("The right of confrontation conferred by the Sixth Amendment is a safeguard to ensure the fairness and accuracy of criminal trials."); *Chambers v. Mississippi*, 410 U.S. 284, 295 (1973) ("The right of cross-examination is more than a desirable rule of trial procedure. It is implicit in the constitu-

---

international practice. Justice Scalia noted in *Crawford* that "the right to confront one's accusers is a concept that dates back to Roman times." *Crawford*, 124 S. Ct. at 1359. He then went on to chronicle the history in England. Although not mentioned in *Crawford*, it bears noting that the right of confrontation is firmly implanted in the jurisprudence of other European countries. For example, the European Convention on Human Rights, articles (6)(1) and (6)(3)(D), give the right "to examine or have examined witnesses against him." The European Court of Human Rights has established a right of confrontation: *Saïdi v. France*, 17 Eur. Ct. H.R. 251, 270 (1993) ("Neither at the stage of the investigation nor during the trial was the applicant able to examine or have examined the witnesses concerned. The lack of any confrontation deprived him in certain respects of a fair trial"). *See also Van Mechelen v. Netherlands*, 25 Eur. Ct. H.R. 647, 673 (1997); *Lüdi v. Switzerland*, 15 Eur. Ct. H.R. 173 (1992); *Windisch v. Austria*, 13 Eur. Ct. H.R. 281 (1990); *Delta v. France*, 16 Eur. Ct. H.R. 574 (1990); *Kostovski v. Netherlands*, 12 Eur. Ct. H.R. 434, 448-49 (1989).

tional right of confrontation, and helps assure the 'accuracy of the truth-determining process.' "); *Dutton v. Evans*, 400 U.S. 74, 89 (1970) (plurality) ("The decisions of this Court make it clear that the mission of the Confrontation Clause is to advance a practical concern for the accuracy of the truth-determining process in criminal trials . . . ."); *Pointer v. Texas*, 380 U.S. 400, 404 (1965) ("[P]robably no one, certainly no one experienced in the trial of lawsuits, would deny the value of cross-examination in exposing falsehood and bringing out the truth in the trial of a criminal case."); *Mattox v. United States*, 156 U.S. 237, 242-43 (1895) (describing the "primary object" of the Confrontation Clause as "to prevent depositions or ex parte affidavits . . . being used against the prisoner in lieu of a personal examination and cross-examination of the witness, in which the accused has an opportunity, not only of testing the recollection and sifting the conscience of the witness, but of compelling him to stand face to face with the jury in order that they may look at him, and judge by his demeanor upon the stand and the manner in which he gives his testimony whether he is worthy of belief"). *See also* M. Hale, History and Analysis of the Common Law of England 258 (1713) (adversarial testing "beats and bolts out the Truth much better") (quoted in *Crawford*, 124 S. Ct. at 1370).

But accuracy and reliability do not exist in a vacuum. Rather, "[t]he central concern of the Confrontation Clause is to ensure the reliability of the evidence against a criminal defendant by subjecting it to rigorous testing in the context of an adversary proceeding before the trier of fact. "The word 'confront,' after all, also means a clashing of forces or ideas, thus carrying with it the notion of adversariness." *Maryland v. Craig*, 497 U.S. 836, 845 (1990). Even more to the point, the Court wrote, "[t]he combined effect of these elements of confrontation—physical presence, oath, cross-examination, and observation of demeanor by the trier of fact—serves the purposes of the Confrontation Clause by *ensuring that evidence admitted against an accused is reliable* and subject to

the rigorous adversarial testing that is the norm of Anglo-American criminal proceedings." *Id.* at 846 (emphasis added).

*Crawford* itself answers the question of whether the absence of cross-examination "so *seriously* diminishe[s] accuracy that there is an impermissibly large risk of punishing conduct the law does not reach" *Summerlin*, 124 S. Ct. at 2525 (internal quotations omitted):

- "The framework is so unpredictable that it fails to provide meaningful protection from even core confrontation violations." *Crawford*, 124 S. Ct. at 1371.

- "[T]he [general reliability] test is *inherently*, and therefore *permanently*, unpredictable. *Id.* at 1374 n.10. "It is difficult to imagine [the general reliability framework] providing any meaningful protection in [politically charged cases]." *Id.* at 1374.

- "[W]e view this as one of those rare cases in which the result below is so improbable that it reveals a fundamental failure on our part to interpret the Constitution in a way that secures its intended constraint on judicial discretion." *Id.* at 1373.

**[7]** Thus, at the heart of the Court's concerns in *Crawford* was the *reliability* of admitted evidence. Where admitted evidence is unreliable, the accuracy of convictions is seriously undermined. That the rule in *Crawford* is one without which the accuracy of convictions would be seriously undermined is further born out by the Court's own description of its prior doctrine as a "rare case" of "fundamental failure." *Id.* at 1373. The difference between pre- and post-*Crawford* Confrontation Clause jurisprudence is not the sort of change that can be dis-

missed as merely incremental. Instead, it is an "absolute pre-requisite to fundamental fairness." *Sawyer*, 497 U.S. at 244.

In *Crawford*, the Court itself faults the previous regime under *Roberts*. *Crawford*, 124 S. Ct. at 1371-73. Indeed, to benchmark reliability against *Roberts* would undermine *Crawford*'s central thesis. Reliance on *Roberts*' judicially-administered reliability test gives illusory comfort, as "[t]he [Confrontation] Clause . . . reflects a judgment . . . about how reliability can best be determined," *id.* at 1370, and "[t]he legacy of *Roberts* in other courts vindicates the Framers' wisdom in rejecting a general reliability exception," *id.* at 1371.**[2]**

The retroactivity inquiry is not conducted in a vacuum. Rather, the analysis is modeled on the *Summerlin* requirements. But even if a "look back" to *Roberts* were appropriate, as Judge Wallace suggests, *Crawford* would be retroactive.

**[8]** Rules that are properly considered retroactive are those that "alter our understanding of the *bedrock procedural elements* essential to the fairness of a proceeding." *Sawyer v. Smith*, 497 U.S. 227, 242 (1990) (internal quotations omitted). As the Court recently stated, "[i]n providing guidance as to what might fall within this exception, we have repeatedly referred to the rule of *Gideon v. Wainright*, 372 U.S. 335 (1963)." *Beard*, 124 S. Ct. at 2514 (citing *Saffle*, 494 U.S. at 495, *Gilmore v. Taylor*, 508 U.S. 333, 364 (1993) (Blackmun, J., dissenting)). Recognizing that bedrock procedural rules are very few in number, it is no leap to conclude that the right of cross-examination as an adjunct to the constitutional right of confrontation joins the very limited company of *Gideon*.

---

**[2]**Judge Wallace's effort to rest the analysis on the reliability test under *Roberts* forces a false dichotomy between reliability and cross-examination and overlooks the fact that "some of the courts that admit untested testimonial statements find reliability in the very factors that *make* the statements testimonial." *Id.* at 1372.

We join one other circuit that has concluded that *Crawford* announces a new rule, although its retroactivity analysis differs from ours. *See Brown v. Uphoff*, 381 F.3d 1219 (10th Cir. 2004). The Second Circuit did not directly address the new rule issue but concluded that even if *Crawford* did announce a new rule, it would not be retroactive. *Mungo v. Duncan*, 393 F.3d 327, 336 (2d Cir. 2004).

Addressing the question of a new rule, the Tenth Circuit reasoned as follows:

> As we explained above, prior to the decision in *Crawford*, *Roberts* provided the appropriate framework for determining whether the admission of hearsay statements violated the Confrontation Clause. The Supreme Court itself noted that the logic of *Roberts* was inconsistent with the Court's conclusion in *Crawford* that the Confrontation Clause requires an opportunity to cross-examine before testimonial hearsay may be admitted against the defendant. *Crawford,* ___ U.S. at ___, 124 S. Ct. at 1369. Thus, *Roberts* and its progeny did not dictate the result in *Crawford* and we conclude that it announces a new rule of constitutional law. *See Crawford*, at ___, 124 S. Ct. at 1374 (Rehnquist, C.J., dissenting) (referring to the majority's holding as a "new interpretation of the Confrontation Clause").

*Brown*, 381 F.3d at 1226. Our analysis is in accord.

But the Tenth Circuit diverges from us in holding that *Crawford* is not retroactive because it does not set forth a watershed rule of criminal procedure. *Id.* Stating that unless a new rule is "on the magnitude of the rule announced in *Gideon v. Wainright*," it will not fit within the *Teague* watershed rule exception, the court explained:

> Unlike *Gideon*, *Crawford* does not 'alter[ ] our understanding of what constitutes basic due process,'

but merely sets out new standards for the admission of certain kinds of hearsay. Confrontation Clause violations are subject to harmless error analysis and thus may be excused depending on the state of the evidence at trial. It would, therefore, be difficult to conclude that the rule in *Crawford* alters rights fundamental to due process.

*Id.* at 1226-27 (internal citations omitted).

The Supreme Court's Confrontation Clause jurisprudence in *Crawford* cannot be dismissed as a mere tweak on the admissibility of hearsay. *See Brown*, 281 F.3d at 1226. The Supreme Court surely did not conceive of it as such. Rather, the Court describes the right of confrontation as a "bedrock procedural guarantee," notes that it "dates back to Roman times" and was part of the common law known to the founding generation. *Crawford*, 124 S. Ct. at 1359. The Court also contrasts "exclusion under the hearsay rules" with "the civil-law abuses the Confrontation Clause targeted." *Crawford*, 124 S. Ct. at 1364. In a rare *mea culpa*, the Court faults itself for not enunciating the *Crawford* rule earlier, stating that "it reveals a fundamental failure on our part to interpret the Constitution in a way that secures its intended constraint on judicial discretion." *Id.* at 1373. There is nothing "mere" about the *Crawford* rule.

The Tenth Circuit mistakenly concluded that rules of constitutional law subject to harmless error review can never be considered bedrock rules of procedure. The two inquiries hinge on different questions. Whether a rule is a bedrock rule of procedure depends on whether it increases the likelihood of accurate conviction. *Summerlin*, 124 S. Ct. at 2523. Whether a rule is subject to harmless error analysis depends on whether the impact of the error can be measured. *See Arizona v. Fulminante*, 499 U.S. 279, 307-08 (1991). Therefore, a rule of constitutional law could be essential to promote accurate convictions, but still subject to harmless error review if the

impact of misapplication of the rule were easily measurable. In short, because accuracy and measurability are different concepts, whether a rule of constitutional law is subject to harmless error review does not answer the question whether it is a bedrock rule of procedure.

[9] After assuming that *Crawford* announced a new rule, the Second Circuit rejected retroactivity, reasoning that the *Crawford* rule would not improve overall accuracy because "it is likely to improve accuracy in some circumstances and diminish it in others." *Mungo*, 393 F.3d at 335. The flaw in this analysis is that the Second Circuit has substituted its judgment of whether the *Crawford* rule is one without which the accuracy of conviction is seriously diminished, for the Supreme Court's considered judgment. The Court has found repeatedly that the purpose of the Confrontation Clause is to promote accuracy, *see, e.g.*, *Tennessee v. Street*, 471 U.S. 409, 415 (1985), and thus *Crawford* rejected the *Roberts* framework as reflective of "a fundamental failure on our part to interpret the Constitution in a way that secures its intended constraint on judicial discretion," *Crawford*, 124 S. Ct. at 1373. Viewing these holdings together leads to the conclusion that the *Crawford* rule is one without which the likelihood of accurate conviction is seriously diminished.

## C. BOCKTING MERITS RELIEF UNDER AEDPA

Having determined that *Crawford* is retroactive, the remaining task is to determine whether, under AEDPA, the Nevada Supreme Court's analysis was either "contrary to, or involved an unreasonable application of, clearly established Federal law." 28 U.S.C. § 2254(d)(1)-(2). The Supreme Court has yet to address directly whether AEDPA was intended or should be read to adopt the *Teague* exceptions. *Williams v. Taylor*, 529 U.S. 362, 380 (2000) (Stevens, J., for four justices) ("AEDPA codifies *Teague* to the extent that *Teague* requires federal habeas courts to deny relief that is contingent upon a rule of law not clearly established at the time the state

conviction became final."). Application of *Teague* is the means by which new rules are made retroactive. As noted earlier, the Court has clarified that the *Teague* and AEDPA inquiries are separate. *Horn*, 536 U.S. at 272. But in directing us to undertake both inquiries in an AEDPA case, the Court has impliedly endorsed the application of *Teague* in the AEDPA context. Further, it appears that Congress intended to preserve the *Teague* exceptions because AEDPA explicitly provides for their application in proceedings involving state habeas petitions. *See* 28 U.S.C. § 2254(e) ("If the applicant has failed to develop the factual basis of a claim in State court proceedings, the court shall not hold an evidentiary hearing on the claim unless the applicant shows that . . . the claim relies on a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court.") But even if Congress' intent is unclear, the constitutional doubt cannon of construction mandates that we read the statute to incorporate the *Teague* exceptions to avoid the serious constitutional problem raised by depriving individuals of bedrock principles of Due Process. *Ferguson v. Palmateer*, 321 F.3d 820, 823 (9th Cir. 2003).

**[10]** The Nevada Supreme Court relied on *Roberts* to conclude that Autumn was "unavailable" and that her statements bore the requisite "particularized guarantees of trustworthiness." *Bockting v. State*, 847 P.2d 1364, 1367-70 (Nev. 1993). As we now know, but the Nevada Supreme Court could not have divined, *Crawford* dictates the right to cross-examine the witness. The progeny of *Roberts*, such as the multi-factor reliability test developed in *Idaho v. Wright*, 497 U.S. 805, 821-22 (9th Cir. 1990), cannot override the right of confrontation. Thus, the Nevada Supreme Court's decision was "contrary to" established Supreme Court precedent in *Crawford*, as made retroactive under *Teague* and *Summerlin*.

It bears noting that *Crawford* requires not only cross-examination but unavailability. We have long acknowledged the sensitive situation presented by the child witness. *See,*

*e.g.*, *Tome v. United States*, 513 U.S. 150, 166 (1995). Indeed, prosecutions for child abuse often rely heavily on such testimony. Here, the trial court's inquiry into Autumn's unavailability was truncated and conclusory at best. When she refused to cooperate, the court simply declared her unavailable. Although this issue is troubling, it is not necessary to reach this question because of the constitutional error related to the lack of cross-examination.

**[11]** The final question is whether admission of Autumn's statement "had substantial and injurious effect or influence in determining the jury's verdict." *See Brecht v. Abrahamson*, 507 U.S. 619, 623 (1993). The detective's testimony regarding Autumn's interview was a critical piece of evidence, particularly in view of Autumn's inconsistent testimony at the preliminary hearing, and weaknesses in Laura Bockting's testimony. Even if Autumn's statement to the mother was, for argument's sake, considered admissible, the detective's description of Autumn's interview was so significant as corroborating evidence that its admission had a substantial and injurious effect or influence in determining the jury's verdict. Thus, the admission of Autumn's statement requires reversal.

## III. CONCLUSION

Because a majority concludes that *Crawford* must be applied in this pending habeas case, Bockting's petition for a writ of habeas corpus is GRANTED.[3]

---

[3] I join part II of Judge Wallace's concurring and dissenting opinion with respect to admission of prior misconduct, vouching, and ineffective assistance of counsel.

NOONAN, Circuit Judge, concurring:

The trial court, the state supreme court, and the federal district court believed that the statute was constitutional, the procedure followed to have been proper, and Bockting's conviction valid. It is now apparent that each of these courts was mistaken and that the statute and the procedure under it are unconstitutional. *Crawford v. Washington*, 124 S. Ct. 1354 (2004). Bockting is entitled to a writ of habeas corpus. The misunderstanding of the law governing the case is comprehensible in the light of the history set out in *Crawford*; nontestimonial hearsay is not subject to an absolute bar. "Where testimonial evidence is at issue, however, the Sixth Amendment demands what the common law required: unavailability and a prior opportunity for cross-examination." *Id.* at 1374.

Autumn was not found to be as unavailable as a witness. She was in fact present at the trial. At most, the Nevada courts determined that Autumn was not willing to be a witness against Bockting. The reasons for her unwillingness were not explored. The possibility of measures short of appearance on the stand in open court were not explored. The fact that she had testified at Bockting's preliminary hearing and had denied the accusations against him was ignored. On the mere ipse dixit of a prosecutor already disappointed by Autumn's testimony at the preliminary hearing, she was disqualified as a witness and the hearsay introduced. The Confrontation Clause of the Sixth Amendment to the Constitution of the United States, applicable by virtue of the Fourteenth Amendment, was violated.

No opportunity for cross-examination by Bockting ever existed. He was, of course, not present when Autumn spoke to her mother or when she spoke to Detective Zinovitch. Totally untested by the method constitutionally required, the two testimonial tales, retold by Laura and the detective, confronted Bockting at his trial. The Confrontation Clause

demanded that he be confronted with the witness against him. U.S. Const. amend. VI.

It is a work of supererogation to praise the wisdom of the Founders and to celebrate the enforcement of a "bedrock procedural guarantee." *Crawford*, 124 S. Ct. at 1359. Nonetheless, the circumstances of this case demonstrate how wise it is to exclude testimony untested by cross-examination. Autumn's first declaration, reported only by her mother, was made at night after Autumn awoke from sleep crying and was questioned by her mother. It may have been an excited or spontaneous utterance but one made under circumstances rendering it less, not more credible. In her mother's words, "She looked like she had just woke up from a bad dream and she was quite upset." It is a commonplace phenomenon for people of all ages to have nightmares and to awake in distress. What they then say was bothering them carries no guarantee of trustworthiness; they are coming out of sleep, still responding to their sleeping state impressions. Autumn's second declaration was made to a police officer in the presence of her mother; she was under psychological compulsion not to let her mother down. As to her play with the dolls and her sexual experience, her mother testified that Autumn had observed her and Bockting having sexual intercourse in the one bedroom trailer in which the family lived and where Autumn slept in a closet area off the bedroom. The language Autumn used in reference to the sexual organs was language her mother testified that she used in discussion with her. Autumn had no motive to accuse her stepfather of criminal assault and, in fact, demonstrated affection for him; she did have a motive to account for her nightmare and to tell the same story the second time when she met the police.

Autumn's statements were further put in doubt by her repudiation of any accusation against Bockting at his preliminary hearing. Further, the report of her statement of her mother must be contextualized by these facts: her mother was an exotic dancer, who sometimes performed in front of Autumn;

her mother was in conflict with Bockting and on the brink of
leaving him; her mother did not report Autumn's nighttime
declaration until two days after she said she heard it.

It is argued that to apply *Crawford* is to apply it retroac-
tively. To the contrary, the Supreme Court, after reviewing its
own decisions, declared:

> Our cases have thus remained faithful to the Fram-
> ers' understanding: Testimonial statements of wit-
> nesses absent from trial have been admitted only
> where the declarant is unavailable, and only where
> the defendant has had a prior opportunity to cross-
> examine.

*Crawford*, 124 S. Ct. at 1369. *Crawford*, therefore, does not
announce a new rule. Retroactivity is not an issue.

True, the chief justice's dissent declared that *Crawford* was
"a new interpretation" that overruled *Ohio v. Roberts*, 448
U.S. 56 (1980). *Id*. at 1374. But as the Court pointed out, *Rob-
erts* itself only admitted testimony that had been subjected to
cross-examination. *Id*. at 1368. Undoubtedly, a number of
courts misinterpreted the Confrontation Clause in the same
way as the Nevada courts did. But correction of a misinterpre-
tation does not create a new rule. It is dangerous to take liter-
ally a dissent. The authentic interpretation of what the Court
is doing comes from the Court itself. If there were any doubt
in this case (which I deny there is), it is completely dispelled
by the Court, again speaking through the author of *Crawford*
in the same term in which *Crawford* was decided. Addressing
new procedural rules without which the likelihood of an accu-
rate conviction is seriously diminished, the Court declared:
"This class of rules is extremely narrow and it is unlikely that
any . . . has yet to emerge." *Schriro v. Summerlin*, 124 S. Ct.
2519, 2522 (2004) (quoting *Tyler v. Cain*, 533 U.S. 656, 667
n.7 (2001)) (alterations and quotation marks omitted). This
declaration is an authoritative determination, delivered less

than four months after *Crawford*, that *Crawford*'s bedrock procedural rule was not a new rule. A change in rationale is not treated by the Supreme Court as a change in rules. *Crawford*, 124 S. Ct. 1369. All along, the bedrock was there.

As an alternative to the foregoing analysis and in order to provide a precedent for this court, I also concur in Judge McKeown's analysis and opinion.

Because the action of the Nevada Supreme Court resulted in a decision that was contrary to established federal law as determined by the Supreme Court of the United States, 28 U.S.C. § 2254 (d)(l), the writ of habeas corpus should issue to free Bockting from his unconstitutional confinement.

**Volume 2 of 2**

WALLACE, Senior Circuit Judge, concurring and dissenting:

Both Judges McKeown and Noonan conclude that the Supreme Court's recent landmark decision, *Crawford v. Washington*, 541 U.S. 36, 124 S. Ct. 1354 (2004), governs our consideration of Bockting's Confrontation Clause claim, although for different reasons. While Judge Noonan would hold that retroactivity is "not an issue" because *Crawford* did not establish a "new rule" within the meaning of *Teague v. Lane*, 489 U.S. 288 (1989), *Ante* at 5902, I concur with that part of Judge McKeown's opinion holding that *Crawford* established a new rule that does not apply retroactively to state convictions on habeas review unless it satisfies one of two narrow exceptions. However, I do not agree that *Crawford* fits within either of those exceptions. Guided by the principles outlined in *Schriro v. Summerlin*, ___ U.S. ___, 124 S. Ct. 2519 (2004), I would hold that *Crawford*'s new procedural rule does not qualify for retroactive application and would analyze Bockting's Confrontation Clause claim under pre-*Crawford* jurisprudence. In doing so, I would reject that claim, as well as Bockting's remaining claims, under the deferential standards of review embodied in the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), and affirm the district court's denial of Bockting's habeas petition.[1] I therefore respectfully dissent.

## I.

I consider first Bockting's contention that the state trial court violated his rights under the Confrontation Clause by admitting Autumn's out-of-court statements.

---

[1]Judge McKeown concurs in part II of this opinion. *See* Ante at 5899 n.3. Therefore, a majority of the court agrees that Bockting's challenges to (a) the admission of evidence of prior misconduct, (b) vouching, and (c) effective assistance of counsel, do not warrant habeas relief.

## A.

Several weeks after this case was argued before us and submitted for decision, the Supreme Court issued *Crawford v. Washington*, 541 U.S. 36, 124 S. Ct. 1354 (2004). Parting ways with the constitutional test formulated in *Ohio v. Roberts*, 448 U.S. 56 (1980), *Crawford* held that in criminal proceedings, "[t]estimonial statements of witnesses absent from trial [are admissible] only where the defendant is unavailable, and *only where the defendant has had a prior opportunity to cross-examine*." *Crawford*, 124 S. Ct. at 1369 (emphasis added).

Bockting argues—and Judge Noonan agrees—that *Crawford* does not raise retroactivity concerns at all because it does not qualify as a "new rule" under *Teague*. Although the Supreme Court took great pains to harmonize *Crawford*'s result with previous Sixth Amendment decisions, I agree with Judge McKeown that *Crawford*'s *ratio decidendi* effected a clear and decisive break from prior precedent. *See Crawford*, 124 S. Ct. at 1369 (observing that "[a]lthough the results of our decision have generally been faithful to the original meaning of the Confrontation Clause, the same cannot be said of our rationales"). Before *Crawford*, controlling precedent permitted courts to admit hearsay evidence against a criminal defendant whenever the declarant was "unavailable" and the evidence had "adequate 'indicia of reliability,' " i.e., fell within a "firmly rooted hearsay exception" or bore "particularized guarantees of trustworthiness." *Roberts*, 448 U.S. at 66. *Crawford*, however, emphatically rejected *Roberts*'s approach to testimonial evidence, arguing that its test demonstrated an "unpardonable . . . capacity to admit core testimonial statements that the Confrontation Clause plainly meant to exclude." 124 S. Ct. at 1371. As the Court in *Crawford* explained:

> [*Roberts*] is too broad: It applies the same mode of
> analysis whether or not the hearsay consists of *ex*

> *parte* testimony. This often results in close constitu-
> tional scrutiny in cases that are far removed from the
> core concerns of the Clause. At the same time, how-
> ever, the test is too narrow: It admits statements that
> *do* consist of *ex parte* testimony upon a mere finding
> of reliability.

*Id.* at 1369. Responding to these concerns, the Court limited
*Roberts*'s reach to cases "[w]here nontestimonial hearsay is at
issue." *Id.* at 1374. In cases involving "testimonial evidence,"
the Court replaced *Roberts* with a new test that has two
requirements: "unavailability and a prior opportunity for
cross-examination." *Id.* Thus, since *Crawford* overruled *Rob-
erts*'s test for the admission of testimonial evidence, the deci-
sion also represents a "new rule" for retroactivity purposes.
*See id.* at 1378 (Rehnquist, C.J., concurring) (characterizing
the majority's opinion as a "new rule"); *Graham v. Collins*,
506 U.S. 461, 467 (1993) ("[T]here can be no dispute that a
decision announces a new rule if it expressly overrules a prior
decision . . . ."); *Teague*, 489 U.S. at 301 ("[A] case
announces a new rule if the result was not *dictated* by prece-
dent existing at the time the defendant's conviction became
final.").

Crawford*'s "new" constitutional rule would only apply
retroactively to final convictions on collateral review if it falls
within certain categories of rules. The Supreme Court recently
clarified the nature and scope of these categories in *Summer-
lin*:

> New *substantive* rules generally apply retroactively.
> This includes decisions that narrow the scope of a
> criminal statute by interpreting its terms, as well as
> constitutional determinations that place particular
> conduct or persons covered by the statute beyond the
> State's power to punish. Such rules apply retroac-
> tively because they "necessarily carry a significant
> risk that a defendant stands convicted of 'an act that

the law does not make criminal' " or faces a punishment that the law cannot impose upon him.

New rules of procedure, on the other hand, generally do not apply retroactively. They do not produce a class of persons convicted of conduct the law does not make criminal, but merely raise the possibility that someone convicted with use of the invalidated procedure might have been acquitted otherwise. Because of this more speculative connection to innocence, we give retroactive effect to only a small set of " 'watershed rules of criminal procedure' implicating the fundamental fairness and accuracy of the criminal proceeding."

124 S. Ct. at 2522-23 (citations omitted), *quoting Bousley v. United States*, 523 U.S. 614, 620 (1998), *and Saffle v. Parks*, 494 U.S. 484, 495 (1990).

Measured against *Summerlin*'s standards, *Crawford* is best classified as a procedural rule. The rule does not "narrow the scope of a criminal statute by interpreting its terms"; nor does it "place particular conduct or persons covered by the statute beyond the State's power to punish." *Id.* at 2522. Rather, by renegotiating the boundaries between admissible and inadmissible evidence, *Crawford* operates solely on a defendant's criminal *proceedings*. *Crawford*'s characterization as a procedural rule is further supported by the *Crawford* decision itself. By labeling the Confrontation Clause as "a procedural rather than a substantive guarantee . . . [that] reflects a judgment . . . about how reliability [of testimonial evidence] can best be determined," the Court endeavored to reinstitute "the constitutionally prescribed *method* of assessing reliability." *Crawford*, 124 S. Ct. at 1370 (emphasis added). While, the line between "substance" and "procedure" may not always be crystal-clear, there can be no serious dispute that *Crawford*'s restriction on testimonial evidence is a "procedural" rule.

Bockting contends that *Crawford* merits retroactive application here because it is a " 'watershed rule[ ] of criminal procedure' implicating the fundamental fairness and accuracy of the criminal proceeding." *Saffle*, 494 U.S. at 495, *citing Teague*, 489 U.S. at 311; *see also Teague* 489 U.S. at 307 (describing this exception as applying to "those procedures that . . . are implicit in the concept of ordered liberty" (quoting *Palko v. Connecticut*, 302 U.S. 319, 325 (1937))). This argument—which Judge McKeown finds persuasive—admittedly has some intuitive appeal; as Bockting observes, the Supreme Court has described "the Sixth Amendment's right of an accused to confront the witnesses against him" as "fundamental," *Pointer v. Texas*, 380 U.S. 400, 403 (1965), and *Crawford* purports to effectuate the Confrontation Clause's original design and thereby enhance the fairness and accuracy of defendants' criminal proceedings. *Crawford*, 124 S. Ct. at 1373. However, the fact that *Crawford* is " 'fundamental' in some abstract sense is not enough" to entitle Bockting to habeas relief. *Summerlin*, 124 S. Ct. at 2523. Under *Teague* and its progeny, *Crawford* does not constitute a "watershed rule" suitable for retroactive application unless the *Roberts* test "so '*seriously* diminishe[s]' accuracy that there is an 'impermissibly large risk' of punishing conduct the law does not reach." *Id.* at 2525, *quoting Teague*, 489 U.S. at 312-13; *see also id.* at 2523 ("This class of rules is extremely narrow, and 'it is unlikely that any . . . ha[s] yet to emerge.' " (*quoting Tyler v. Cain*, 533 U.S. 656, 667 n.7 (2001)) (internal quotation marks and citation omitted)).

In evaluating the *Roberts* test, the Supreme Court's analysis in *Summerlin* is instructive. The question presented there was whether *Ring v. Arizona*, 536 U.S. 584 (2002), the Court's decision that juries must determine the existence of any aggravating factor necessary for imposition of the death penalty, applied retroactively to cases already final on direct review. In assessing whether *Ring* represented a true "watershed" procedural rule, the court reviewed scholarly commentary relating to the accuracy of judicial factfinding and

concluded that the evidence was "simply too equivocal" to justify *Ring*'s retroactive application: "[w]hen so many presumably reasonable minds continue to disagree over whether juries are better factfinders . . . , we cannot confidently say that judicial factfinding *seriously* diminishes accuracy." *Summerlin*, 124 S. Ct. at 2525. The Court also stressed that this conclusion followed logically from its observation in *DeStefano v. Woods*, 392 U.S. 631 (1968) (per curiam), "that, although 'the right to jury trial generally tends to prevent arbitrariness and repression[,] . . . [w]e would not assert . . . that every criminal trial—or any particular trial—held before a judge alone is unfair or that a defendant may never be as fairly treated by a judge as he would be by a jury.' " *Summerlin*, 124 S. Ct. at 2525, *quoting DeStefano*, 392 U.S. at 633-34 (internal quotation marks omitted). The Court reasoned that if "a trial held entirely without a jury was not impermissibly inaccurate, it is hard to see how a trial in which a judge finds only aggravating factors could be." *Id.* at 2526. *Summerlin* thus did not extend *Ring* retroactively to cases on habeas review notwithstanding the Court's recognition that "[t]he right to jury trial is fundamental to our system of criminal procedure." *Id.*

Although *Summerlin* does not directly control the outcome of this case, the close similarities between the two cases are compelling. As in *Summerlin*, there is no clear consensus over the comparative effects *Roberts* and *Crawford* might have on the accuracy of jury verdicts, *see Crawford*, 124 S. Ct. at 1377-78 (Rehnquist, C.J., concurring), much less any evidence that *Roberts* "so '*seriously* diminishe[s]' accuracy that there is an 'impermissibly large risk' of punishing conduct the law does not reach," *Summerlin*, 124 S. Ct. at 2525, *quoting Teague*, 489 U.S. at 312-13. Nor am I prepared to assert that all testimonial hearsay evidence admitted without the opportunity for cross-examination necessarily renders a criminal trial "impermissibly inaccurate," *id.* at 2526, or otherwise "unfair," *id.* at 2525, *quoting DeStefano*, 392 U.S. at 634. Even assuming *Crawford*'s reinterpretation of the Confronta-

tion Clause is in some sense "fundamental" and accuracy-enhancing, it does not follow that "[t]he values implemented by [that] right . . . would . . . measurably be served by requiring retrial of all persons convicted in the past by procedures not consistent with the Sixth Amendment right" as it is currently understood. *Summerlin*, 124 S. Ct. at 2525-26, *quoting DeStefano*, 392 U.S. at 634. There is simply no solid evidence that *Roberts* has so seriously undermined the accuracy of criminal proceedings as to discredit the host of final convictions generated pursuant to its authority.

Judge McKeown, however, concludes that *Crawford* is retroactive, because "the evidence that cross-examination seriously decreases the possibility of inaccurate conviction is unequivocal." *Ante* at 5890-91. In her view, "*Crawford* itself answers the question of whether the absence of cross-examination "so *seriously* diminishe[s] accuracy that there is an impermissibly large risk of punishing conduct the law does not reach." *Ante* at 5880, *quoting Summerlin*, 124 S. Ct. at 2525. But that is the wrong question. Prior to *Crawford*, courts may not have been required to exclude an unavailable witness's out-of court testimonial statement that was not was subject to cross-examination, but they were required to exclude statements that did not have "adequate indicia of reliability." *Roberts*, 448 U.S. at 66. Thus, the question is not whether testimony that has been subject to cross-examination is more likely to be reliable than testimony that has not. Rather, the question is whether testimony admissible under *Roberts* is so much more unreliable than that admissible under *Crawford* that the *Crawford* rule is "one without which the likelihood of an accurate conviction is *seriously* diminished." *Summerlin*, 124 S. Ct. at 2523 (internal quotation marks omitted).

The Supreme Court's decision in *Sawyer v. Smith*, 497 U.S. 227 (1990) illustrates the principle that a new rule qualifies as a "watershed rule[ ] of criminal procedure," *Teague*, 489 U.S. at 311, only if it represents a substantial improvement over

the previously existing rule. In *Sawyer*, the Court addressed the question whether a habeas petitioner could claim the benefit of *Caldwell v. Mississippi*, 472 U.S. 320 (1985), which was decided after the petitioner's conviction became final and which "held that the Eighth Amendment prohibits the imposition of a death sentence by a sentencer that has been led to the false belief that the responsibility for determining the appropriateness of the defendant's capital sentence rests elsewhere." *Sawyer*, 497 U.S. at 233. After concluding that *Caldwell* established a "new rule," *id.* at 233-41, the Court addressed whether *Caldwell* fit within either of *Teague*'s exceptions. But, in addressing whether *Caldwell* qualified as a " 'watershed rule[ ] of criminal procedure,' " *id.* at 241, *quoting Saffle*, 494 U.S. at 495, the Court did not simply ask whether sentences imposed in violation of *Caldwell* were much less accurate than those imposed in compliance with *Caldwell*. Rather, the Court compared *Caldwell* against "the rule of [*Donnelly v. DeChristoforo*, 416 U.S. 637 (1974), which] was in place [at the time of the petitioner's trial and appeal] to protect any defendant who could show that a prosecutor's remarks had in fact made a proceeding fundamentally unfair." *Sawyer*, 497 U.S. at 243. Although the Court's "concern in *Caldwell* was with the 'unacceptable risk' that misleading remarks could affect the reliability of the sentence," *Caldwell* had merely been "added to an existing guarantee of due process protection against fundamental unfairness." *Id.* at 244. Thus, the Court in *Sawyer* could not say that *Caldwell*'s "systemic rule enhancing reliability is an 'absolute prerequisite to fundamental fairness,' of the type that may come within *Teague*'s second exception." *Id.*, *quoting Teague*, 489 U.S. at 314.

Here, too, *Crawford*'s new rule must be judged against the background in which it was decided, by comparing it to the rule of *Roberts*. Although certain language in Judge McKeown's opinion suggests that she purports to do so, *see Ante* at 5893-94 ("The difference between pre- and post-*Crawford* Confrontation Clause jurisprudence is not the sort of change

that can be dismissed as merely incremental."), she never actually asks the question upon which *Crawford*'s retroactivity turns: Does the admission of testimony which has been judicially determined to bear "adequate indicia of reliability" (as *Roberts* required), but which has not necessarily been subject to cross-examination (as *Crawford* requires), "so *seriously* diminish[ ] accuracy that there is an impermissibly large risk of punishing conduct the law does not reach"? *Summerlin*, 124 S. Ct. at 2525 (internal quotation marks omitted). As explained above, the answer to that question should not be in the affirmative.

Yet another flaw in Judge McKeown's analysis is her focus on language in *Crawford* suggesting that the new rule announced in that case is truer to the Framers' design. For example, she quotes the Court's statement that "[t]he Framers would be astounded to learn that *ex parte* testimony could be admitted against a criminal defendant because it was elicited by 'neutral' government officers." *Crawford*, 124 S. Ct. at 1373. *See Ante* at 5890. "The question here is not, however, whether the Framers believed that [cross-examination provides a] more accurate [means of testing the reliability of testimony] than [judicial determinations of 'reliability' pursuant to *Roberts*]," but "whether [the *Roberts* test] so *seriously* diminishe[s] accuracy that there is an impermissibly large risk of punishing conduct the law does not reach." *Summerlin*, 124 S. Ct. at 2525 (internal quotation marks omitted). That the Framers made a particular judgment about the best way to ensure the reliability of testimony does not mean that any rule other than the one they envisioned creates an impermissibly high risk of inaccurate conviction.

The focus of Justice Scalia's analysis in *Crawford* was on *Roberts*' fidelity to the Framers' intentions, rather than the accuracy of convictions obtained under the *Roberts* regime. *See, e.g.*, *Crawford*, 124 S. Ct. at 1359 ("Petitioner argues that [the *Roberts*] test strays from the original meaning of the Confrontation Clause and urges us to reconsider it."); *id.* at 1369

("Although the results of our decisions have generally been faithful to the original meaning of the Confrontation Clause, the same cannot be said of our rationales."); *id.* at 1370 ("Where testimonial statements are involved, we do not think the Framers meant to leave the Sixth Amendment's protection to the vagaries of the rules of evidence, much less to amorphous notions of 'reliability.' "). True, the Court stated that "[t]he [Confrontation] Clause . . . reflects a judgment . . . about how reliability can best be determined," *id.* at 1370; that "[t]he legacy of *Roberts* in other courts vindicates the Framers' wisdom in rejecting a general reliability exception," *id.* at 1371; and even that "[r]eliability is an amorphous, if not entirely subjective, concept." *Id.* But, even if one assumes that the Framers were correct as an empirical matter that cross-examination is the best way to ensure the reliability of testimony, that does not mean that any other method impermissibly threatens punishing the innocent.

Finally, Judge McKeown's analysis is contrary to that of three other circuits that have held that *Crawford*'s rule does not fit within either of *Teague*'s exceptions. *See Brown v. Uphoff*, 381 F.3d 1219, 1225-27 (10th Cir. 2004); *Evans v. Luebbers*, 371 F.3d 438, 444-45 (8th Cir. 2004); *Mungo v. Duncan*, 393 F.3d 327, 335-36 (2d Cir. 2004). Although Judge McKeown criticizes *Brown* on the ground that "[t]he Tenth Circuit mistakenly concluded that rules of constitutional law subject to harmless error review can never be considered bedrock rules of procedure," *see Ante* at 5896, that attack is not well-founded. Our own decision in *United States v. Sanchez-Cervantes*, 282 F.3d 664 (9th Cir. 2002), which held that *Apprendi v. New Jersey*, 530 U.S. 466 (2000) does not apply retroactively, employed the very reasoning that Judge McKeown finds objectionable. *See Sanchez-Cervantes*, 282 F.3d at 670 ("By applying harmless error analysis or plain error review to *Apprendi* claims, we have necessarily held that *Apprendi* errors do not render a trial fundamentally unfair. Therefore, it would seem illogical to hold that such an error is a watershed rule that 'implicate[s] the fundamental

fairness of the trial' " (quoting *Teague*, 489 U.S. at 312) (foot-note omitted)). The Tenth Circuit's reasoning in *Brown* is entirely consistent with our own in *Sanchez-Cervantes*, and provides yet another reason why Judge McKeown's analysis is unpersuasive.

For the foregoing reasons, I conclude that *Crawford* does not qualify as a "watershed rule[ ] of criminal procedure" appropriate for retroactive application to convictions already final on direct review. *Teague*, 489 U.S. at 311. Like the Second Circuit in *Mungo*, *see* 393 F.3d at 334-35, and unlike Judge McKeown, *see* Ante at 5897-98, I therefore would not reach the question whether AEDPA "nullifies" the *Teague* exceptions, such that no "new rule"—even one fitting within one of those exceptions—may serve as the basis for habeas relief.

Nonetheless, to determine whether I can concur in the result, I must evaluate Bockting's Confrontation Clause claim according to the standards articulated in *Roberts* and our own pre-*Crawford* decisions.

## B.

Because Judge McKeown's opinion does not get to the application of pre-*Crawford* law to Bockting's Confrontation Clause claim, it was not necessary for her to go into detail regarding the facts of this case that are relevant to such analysis, therefore I add them here.

At Bockting's March 30, 1988, preliminary hearing, Laura described Autumn's abuse allegations and other events leading up to Bockting's arrest. Prosecutors then called Autumn to the stand. Autumn testified that she knew the difference between the truth and a lie and answered preliminary questions about the alleged assault and subsequent rape examination. As the prosecutor probed more deeply into the details of Bockting's alleged assault, Autumn began to cry and averred

that she could not remember basic facts such as what occurred in the bathroom with her father and whether she discussed her father's alleged assault with Detective Zinovitch. The judge asked Laura to take a seat next to Autumn on the witness stand, and Laura encouraged Autumn to "be honest" and "tell the truth." Responding that "[y]ou already told them," Autumn refused to answer any further questions. The judge declared Autumn unavailable as a witness.

Bockting's jury trial commenced on August 15, 1988. The government, represented by Deputy District Attorney John Lukens, called Autumn as its first witness. The trial transcript reads as follows:

> The Court:    Very good then. Mr. Lukens, your first witness.
>
> Mr. Lukens:   Autumn Bockting.
>
>                       *     *     *
>
> The Court:    How are you doing, Autumn? Autumn, you okay? All right. Continuation of case C83110, State of Nevada versus Marvin Howard Bockting. The record will reflect the presence of defendant; his counsel, Mr. Blaskey; Mr. Lukens representing the State[;] the absence of the jury. And we have on the stand Autumn Jean Tresler Bockting.
>
>                  All right. Go ahead, counsel.
>
> Mr. Lukens:   Autumn, this is when you have to stand up to be sworn.
>
> The Court:    Can you stand up, Autumn? Can you stand up and raise your hand for me?

|  | Autumn, stand up now and raise your hand for us, okay. |
|---|---|
| Mr. Lukens: | Your Honor, I think under these conditions, I think that the witness is unable to testify. |
| The Court: | Well, I think it is apparent without the jury if we can't get anything more than this, it is not likely when the jury is here we will do any better. Go ahead and assist, will you please. |
|  | Counsel approach the bench, please. |
|  | (Discussion at the bench which was not reported.) |
| Mr. Lukens: | Your Honor, at this time since the Court has observed for itself the inability of Autumn Bockting to testify due to the emotional conflict that goes on within her, the State intends pursuant to [Nevada Revised Statute] 51.385 to offer into evidence the statements made by Autumn Bockting to both her mother, Laura, and Detective Zinovitch and, to a more limited extent, Diane Donovan. |
|  | This offer is made pursuant to [Nevada Revised Statute] 51.385 which states in pertinent part that, "In addition to any other provision for admissibility, a statement made by a child under the age of 10 years, describing any act of sexual conduct |

performed with or on the child, is admissible in a criminal proceeding regarding that sexual conduct if, A, the Court finds in hearing outside the presence of the jury that the time, content and circumstances of the statement provides sufficient circumstantial guarantees of trustworthiness, and, B, the child testifies at the proceeding or is unavailable or unable to testify." I submit that portion B has been met.

And, in addition, under [the provision formerly designated] Subsection [2], it says, "If the child is unavailable or unable to testify, written notice must be given to the defendant 10 days before the trial if the prosecution intends to offer the statements in evidence."

I would submit that the State has complied with that and that such notice was filed on August 2nd, 1988 and is styled Notice Pursuant to [Nevada Revised Statute] 51.385 wherein I gave notice of the three individuals who I intend to call as to Autumn's statements.

The Court: Very well. . . .

After hearing testimony from Laura and Detective Zinovitch outside the presence of the jury, the judge concluded that Autumn's hearsay statements were admissible under Nevada Revised Statutes 51.385 because Autumn was effectively unavailable for questioning:

> The very purpose of this statute was to avoid the problem we have here today where a little girl either is not willing to testify or for some reason is unable to or testifies in such an inconsistent manner that it means, in essence, that their testimony is worthless; and because of the fact that she is testifying in open court in front of strangers with all the things that surrounds that kind of a setting. . . . The little girl is obviously unavailable. And as far as these two statements, I am meaning the one to the mother and the one to Detective Zinovitch, I think they are allowed —they are credible enough to be allowed to be related to the jury.

*Roberts* outlines two preconditions for the introduction of out-of-court statements against a criminal defendant. First, the government must establish the declarant's "unavailability" to testify as a witness at trial. *Bains v. Cambra*, 204 F.3d 964, 973 (9th Cir. 2000), *citing Roberts*, 448 U.S. at 65-66. Second, the government must demonstrate that the hearsay statements bear "adequate indicia of reliability" by showing that they either fall "within a firmly rooted hearsay exception" or contain "particularized guarantees of trustworthiness." *Roberts*, 448 U.S. at 65-66. In Bockting's state proceedings, the Nevada Supreme Court determined that the government satisfied these two requirements, *see Bockting v. State*, 847 P.2d 1364, 1366-70 (Nev. 1993) (per curiam), and Bockting challenges these determinations on federal habeas review. Mindful of a federal court's duty to defer to the state supreme court's factual determinations and reasonable applications of Supreme Court precedent, 28 U.S.C. § 2254(d)(1)-(2), I consider each *Roberts* requirement in turn.

1.

Bockting first asserts that the Nevada Supreme Court's decision is not entitled to deference under AEDPA because the court failed to review whether Autumn was available to

testify at trial. The record does not support this characterization of the state supreme court's findings. When Autumn refused to cooperate as a trial witness, the prosecution moved to introduce her hearsay statements through the testimony of her mother, Detective Zinovitch, and Doctor Donovan pursuant to Nevada Revised Statute 51.385, which provides for the introduction of a child's hearsay statements if they are "unavailable or unable to testify." NEV. REV. STAT. 51.385. Before granting the prosecution's motion, the trial court made a clear, particularized finding that Autumn's refusal to cooperate on the stand had rendered her "obviously unavailable." The Nevada Supreme Court, while observing that Nevada Revised Statute 51.385 "does not require the unavailability of a hearsay declarant as a prerequisite to the admissibility of the declarant's statements," nonetheless explicitly affirmed the trial court's determination "that the child was unavailable as a witness." *Bockting*, 847 P.2d at 1366 n.4; *see also* NEV. REV. STAT. 51.385 (allowing the introduction of hearsay statements when "[t]he child testifies at the proceeding" in addition to when the child "is unavailable or unable to testify"). I would therefore reject Bockting's argument that the state supreme court's unavailability determination is not entitled to deference because the trial court failed to ascertain whether Autumn was available to testify at trial.

A more difficult question is whether the Nevada Supreme Court's substantive unavailability determination was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). In past decisions, the Supreme Court has not found it necessary to decide whether a child witness is "unavailable" for Confrontation Clause purposes when the child is merely emotionally or developmentally incapable of testifying in that forum. *See Idaho v. Wright*, 497 U.S. 805, 815-16 (1990). As a general matter, however, the Court held in *Roberts* that "a witness is not 'unavailable' . . . unless the prosecutorial authorities have made a *good-faith effort* to obtain [her] presence at trial."

*Roberts*, 448 U.S. at 75, *quoting Barber v. Page*, 390 U.S. 719, 724-25 (1968) (emphasis added).

Seizing on *Roberts*'s good faith requirement, Bockting makes a plausible argument that child witnesses who refuse to testify in a courtroom setting should not be considered "unavailable" unless the government first makes a good-faith attempt to secure their testimony through closed circuit television or some other medium amenable to cross-examination. I need not consider the merits of Bockting's proposal, however, because my task here is not to decide what might be best; instead, my review is limited to whether the Nevada Supreme Court's application of *Roberts* was *unreasonable*. *See* 28 U.S.C. § 2254(d). On its face, *Roberts* requires no more than "a good-faith effort to obtain [a witness's] presence at trial," *Roberts*, 448 U.S. at 75 (emphasis removed), *quoting Barber*, 390 U.S. at 724-25, and the government arguably satisfied this requirement here by (1) securing Autumn's physical "presence" at trial and (2) making "a good-faith effort" to elicit her testimony in that forum.

The Supreme Court's more recent decisions dealing with alternative procedures for obtaining trial testimony do not materially advance Bockting's habeas petition. Although the Supreme Court has permitted states to substitute one-way closed circuit television for in-court child testimony under certain circumstances, *see Maryland v. Craig*, 497 U.S. 836, 855 (1990), it has never intimated that the Constitution *requires* the government to attempt such alternative procedures as a precondition for an unavailability finding. *Cf. Wright*, 497 U.S. at 818 ("Out-of-court statements made by children regarding sexual abuse arise in a wide variety of circumstances, and we do not believe the Constitution imposes a fixed set of procedural prerequisites to the admission of such statements at trial."). To the contrary, the Court has emphatically rejected the assertion that *Craig*, 497 U.S. at 855, and *United States v. Coy*, 487 U.S. 1012, 1021 (1988), require the government to demonstrate "necessity" before

introducing pretrial hearsay statements. *See White v. Illinois*, 502 U.S. 346, 358 (1992) ("There is . . . no basis for importing the 'necessity requirement' announced in [*Craig* and *Coy*] into the much different context of out-of-court declarations . . . ."). I would hold, therefore, that the Nevada Supreme Court's failure to insist upon alternative procedures for procuring Autumn's contemporaneous testimony did not involve an unreasonable application of *Roberts*, *Craig*, or *Coy*.

Setting aside Bockting's assertions of legal error, I must decide whether the Nevada Supreme Court's unavailability finding "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2); *see also Taylor v. Maddox*, 366 F.3d 992, 999 (9th Cir. 2004) (holding that subsection 2254(d)(2) "applies . . . to situations where petitioner challenges the state court's findings based entirely on the state record"). Under this deferential standard of review, I may not "determine that the state-court factfinding process is defective in some way" unless I am " satisfied that any appellate court to whom the defect is pointed out would be unreasonable in holding that the state court's fact-finding process was adequate." *Taylor*, 366 F.3d at 1000.

The record does not support Bockting's claim that the Nevada Supreme Court's reliance on the trial court's unavailability finding "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2); *see also Gill v. Ayers*, 342 F.3d 911, 917 n.5 (9th Cir. 2003) (explaining that when a state supreme court summarily adopts a lower court's finding of fact "we look through the unexplained . . . decision to the last reasoned decision . . . as the basis for the state court's judgment" (internal quotation marks, brackets, and citation omitted)). At Bockting's preliminary hearing, Autumn initially responded to the prosecution's inquiries with incomplete or evasive answers, then quickly broke into tears and refused to answer any further questions. Efforts to elicit

her testimony at trial were even less fruitful, as she refused so much as to stand or to raise her hand to be sworn in as a witness. The trial transcript does not paint a detailed portrait of Autumn's demeanor on the latter occasion, but there are strong hints that Autumn was distraught and uncommunicative from the start, leading the state trial court to conclude that there was no use pursuing further questioning before the jury. I therefore am not "convinced that an appellate panel, applying the normal standards of appellate review, could not reasonably conclude" that Autumn was emotionally incapable of testifying at trial. *Taylor*, 366 F.3d at 1000. To the contrary, deference to state courts is particularly appropriate in a case such as this, where findings of fact turn on a trial court's eyewitness evaluation of a child witness's demeanor. *Cf. Wainwright v. Witt*, 469 U.S. 412, 428 (1985) ("[D]eterminations of demeanor . . . . [are] entitled to deference even on direct review; '[t]he respect paid such findings in a habeas proceeding should be no less.' " (quoting *Patton v. Yount*, 467 U.S. 1025, 1038 (1984))). As Bockting did not present any evidence in federal district court to challenge the state trial court's findings, I presume that the trial court's findings are correct. *See* 28 U.S.C. § 2254(e)(1); *Taylor*, 366 F.3d at 1000 ("Once the state court's fact-finding satisfies this intrinsic review [on the record,] . . . the state court's findings are dressed in a presumption of correctness . . . .").

In sum, Bockting has not established that the Nevada Supreme Court's unavailability determination was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," 28 U.S.C. § 2254(d)(1), or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding," *id.* § 2254(d)(2).

2.

Turning to *Roberts*'s "adequate indicia of reliability" requirement, the Nevada Supreme Court acknowledged that

Autumn's hearsay statements did not fit within any "firmly rooted hearsay exception" but held that her statements bore the requisite "particularized guarantees of trustworthiness" for admission under *Roberts*. *Bockting*, 847 P.2d at 1367-70. Applying the multifactor test outlined in *Wright*, 497 U.S. at 821-22, the court identified several circumstances which, in its view, buttressed the "trustworthiness" of Autumn's abuse allegations, including: (1) the "spontaneity and consistent repetition" of her statements, (2) the "agitation and fear" before first recounting the experience to her mother as evinced by "the fact that she was visibly shaken and crying," (3) her apparent "knowledge of sexual conduct not present in most children six years of age," (4) her "child-like terminology" which "was reflective of candor rather than coaching," and (5) her "display of affection for Bockting . . . indicative of love rather than hate." *Bockting*, 847 P.2d at 1369.

Bockting argues that the Nevada Supreme Court evaluated the trustworthiness of Autumn's statements based on an unreasonable application of Supreme Court precedent, because it mistakenly interpreted *Wright* to prohibit consideration of any evidence that did not support trustworthiness. *Wright* held that in evaluating whether a declarant's statement bears " 'particularized guarantees of trustworthiness[,]' . . . relevant circumstances include only those that surround the *making* of the statement," not evidence corroborating the *substance* of a declarant's hearsay statements (e.g., physical evidence of sexual abuse). *Wright*, 497 U.S. at 819 (emphasis added). Although *Wright* did not decide whether courts may consider noncorroborating evidence that refutes the substance of a declarant's statements (e.g., physical evidence contradicting an accuser's abuse allegations), *see Swan v. Peterson*, 6 F.3d 1373, 1381 (9th Cir. 1993)—an issue not before us here —the Court's reasoning strongly suggests that courts must at least consider any circumstances surrounding the making of an out-of-court statement that challenge the statement's trustworthiness (e.g., inconsistencies, motives to fabricate). *See Wright*, 497 U.S. at 825-27; *Webb v. Lewis*, 44 F.3d 1387,

1392 (9th Cir. 1994) (holding that *Wright* "does not forbid recourse to other evidence that confirms the presumptive unreliability of the hearsay"); *Swan*, 6 F.3d at 1381 n.7 (reasoning in dicta that "[b]ecause *Wright* holds that the consistency of a child witness's allegations bears on the reliability of an initial hearsay statement, arguably a later *inconsistent* statement should also be evaluated in making the reliability determination").

I need not decide, however, if a categorical refusal to consider evidence challenging the trustworthiness of Autumn's out-of-court statements would constitute an objectively unreasonable application of *Wright*, for the record does not support Bockting's assertion that the Nevada Supreme Court "explicitly refused to consider evidence" establishing the unreliability of Autumn's accusations in this case. Footnote 8 of the state supreme court's opinion characterizes *Wright* as excluding "corroborative evidence . . . in determining the reliability of hearsay statements" and hypothesizes that *Wright* might require courts "to exclude evidence of marital discord on the part of the parents as a possible motive in the mother for having the child fabricate charges of sexual abuse against the husband." *Bockting*, 847 P.2d at 1369 n.8. Although these statements suggest the court might have mis*interpreted* *Wright* to some degree, they do not clearly establish that the court mis*applied Wright* in this case by refusing to consider critical, admissible evidence such as the marital discord between Bockting and Laura. In the body of its opinion, the court stated it reached its trustworthiness determination based on "*the totality of the circumstances* surrounding the child's out-of-court statements" and asserted that "[n]either the [five] factors [listed above] *nor any other aspect of the record evidence* provides insights into a motive for dissembling on the part of the child." *Id.* at 1369-70 (emphasis added). True, the court did not expressly discuss the Bocktings' marital discord and certain other evidence damaging to the trustworthiness of Autumn's statements, but it did refer to Laura's testimony that Autumn "had seen adult sexual organs in the past, had show-

ered with both her mother and Bockting, and had seen her mother and stepfather having intercourse after entering the bedroom unnoticed by the adults." *Id.* at 1369 n.7. Given the Nevada Supreme Court's assertion that it considered all the "record evidence" in assessing Bockting's claims, it would appear that its "totality of the circumstances" analysis did, in fact, embrace the Bocktings' marital problems and other relevant circumstances surrounding Autumn's out-of-court statements. I would thus reject Bockting's contention that the Nevada Supreme Court unreasonably applied *Wright*'s restrictions on corroborating evidence.

The ultimate determination "[w]hether [Autumn's] hearsay statements were sufficiently reliable to be admitted without violating [*Roberts*] is a mixed question" of law and fact, *Swan*, 6 F.3d at 1379, so I review the Nevada Supreme Court's reliability determination to ascertain whether it "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1); *see also Davis v. Woodford*, 333 F.3d 982, 990 (9th Cir. 2003) (stating that subsection 2254(d)(1) applies "to mixed questions of law and fact" (citing *Williams v. Taylor*, 529 U.S. 362, 407-09 (2001)). To the extent the Nevada Supreme Court's "particularized guarantees of trustworthiness" rest on findings of fact, I must decide whether the determination "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2).

Bockting argues that neither the spontaneity and emotional intensity of Autumn's allegations nor her apparent lack of motive to fabricate are indicative of truthfulness, because they can easily be explained away by one of two alternative theories. First, he observes that Autumn delivered her original abuse account shortly after arising from sleep and contends that she could have been recounting a fantastical nightmare. This "nightmare" theory is entirely speculative and appears

implausible given the graphic specificity of Autumn's allegations. Second, Bockting posits that Laura might have fabricated the abuse allegations herself and coached Autumn through the police interviews. Like the "nightmare" theory, this "coaching" theory is utterly unsubstantiated by the record, and it fails to account for Autumn's spontaneous use of dolls to describe the assault during her interview with Zinovitch and the child-like terminology Autumn used to describe her abuse. *See Bockting*, 847 P.2d at 1368. Because Bockting's speculation and conjecture do not establish that the Nevada Supreme Court's factual findings were "unreasonable" with respect to Autumn's spontaneity, mental state, and motive, 28 U.S.C. § 2254(d)(2), I presume these findings are correct, *id.* § 2254(e)(1). *See Taylor*, 366 F.3d at 1000.

Somewhat more compelling is Bockting's challenge to the Nevada Supreme Court's reliance on Autumn's "knowledge of sexual acts that a child of six would not usually be aware of absent personal experience." *Bockting*, 847 P.2d at 1369. Laura conceded at trial that Autumn had seen adult sexual organs, had showered with each of her parents, had watched her mother practice exotic dancing, and had observed her parents engaging in sexual intercourse after entering the bedroom unnoticed. Bockting elaborated on Laura's testimony, alleging that Autumn had witnessed her parents engage in oral sex and was herself "interested" in sex. For these reasons alone, the state supreme court had reason to suspect that Autumn's familiarity with adult sexual acts would exceed that of the average six-year-old. On the other hand, the state supreme court concluded that the testimony of Autumn's parents did not adequately account for Autumn's ability to "demonstrate[ ] through the use of the dolls the positions that would have been necessary for the acts to take place between a large adult male and a small female child" and to describe "how she held onto the [bathroom] sink while Bockting was behind her and 'would press real hard and it hurt.' " *Id.* The substance of Autumn's allegations disclosed knowledge of sexual acts gained from direct personal experience, not remote observa-

tion. Thus, it was not unreasonable for the state supreme court to find, as it did, that Autumn's prior exposure to adult sexual acts did not adequately explain her familiarity with the specific acts described in her abuse allegations.

Arguably the weakest link in the Nevada Supreme Court's "particularized guarantees of trustworthiness" determination is its finding that "sufficient . . . consistent repetition existed in [Autumn's] various statements." *Id.* Autumn's abuse allegations to her mother and Detective Zinovitch were substantially identical, so it was not unreasonable for the state supreme court to conclude that Autumn's "restatement of her travails [to Detective Zinovitch] was consistent with the details she had previously told to her mother." *Id.* at 1368. On the other hand, the court did not mention that Autumn's out-of-court statements contradicted her testimony at the preliminary hearing in several material respects. The Nevada Supreme Court's inattention to these inconsistencies in Autumn's statements is potentially significant under AEDPA; as the Supreme Court has observed and we have held, section 2254(d)(2) allows habeas relief "where the state has before it, yet apparently ignores, evidence that supports [a] petitioner's claim." *Taylor*, 366 F.3d at 1001 (paraphrasing *Miller-El v. Cockrell*, 537 U.S. 322, 346 (2003)).

Although the Nevada Supreme Court did not expressly discuss Autumn's statements at the preliminary hearing when evaluating the consistency of her out-of-court statements, it did not ignore these statements altogether. The court clearly recognized the inconsistencies in Autumn's statements, because the "Facts" section summarized Autumn's relevant testimony at the preliminary hearing. *See Bockting*, 847 P.2d at 1365 ("At the preliminary hearing, . . . . [Autumn] stated that her pants were never removed [during the alleged abuse] and that she could not remember how Bockting touched her."). Thus, this testimony was an "aspect of the record evidence" that the state supreme court incorporated into its evaluation of the "totality of the circumstances surrounding the

child's out-of-court statements, as defined in *Wright*." *Id.* at 1369-70. As such, I would reject Bockting's assertion that the state supreme court "fail[ed] to consider and weigh relevant evidence that was properly presented." *Taylor*, 366 F.3d at 1001.

Moreover, Autumn's testimony at the preliminary hearing does not compel the conclusion that the Nevada Supreme Court's reliability analysis runs "contrary to, or involve[s] an unreasonable application of," *Roberts* or *Wright*. 28 U.S.C. § 2254(d)(1). As we recently explained, "the Supreme Court has specifically 'decline[d] to endorse a mechanical test for determining 'particularized guarantees of trustworthiness' under [*Roberts*],' " and " 'courts have considerable leeway in their consideration of appropriate factors.' " *Parle v. Runnels*, 387 F.3d 1030, 1039 (9th Cir. 2004), *quoting Wright*, 497 U.S. at 822. In this case, the state supreme court had good reason to focus on the consistency of Autumn's statements to her mother and Detective Zinovitch and discount the reliability of her in-court statements as factors in its reliability analysis. Autumn's testimony at the preliminary hearing was patently evasive, perhaps reflecting her emotional state, her desire to minimize harm to her stepfather, and her embarrassment at being asked to discuss the assault's graphic details in an open public forum. Doctor Donovan's expert testimony also indicated that Autumn's equivocation at the preliminary hearing was consistent with the denial phase child abuse victims commonly endure after a sexual assault. Considering the totality of the circumstances surrounding Autumn's hearsay statements, *see id.* at 820, I am not persuaded that the Nevada Supreme Court applied *Roberts* and *Wright* unreasonably by holding that Autumn's testimony at the preliminary hearing does not singlehandedly tip the scale of reliability against the admission of her out-of-court statements.

Since the Nevada Supreme Court's "unavailability" and "adequate indicia of reliability" determinations satisfy

AEDPA's stringent standard of review, Bockting's Confrontation Clause claim fails.

## II.

In addition to his Confrontation Clause claim, Bockting raises several other claims in support of his habeas petition. Although neither Judge McKeown nor Judge Noonan discuss these issues, I explain why these arguments should not require reversal.

## A.

Bockting contends that the state trial court violated his right to due process by admitting witness testimony regarding a prior accusation of sexual misconduct. Bockting takes issue with the following exchange between Deputy District Attorney Lukens and Laura, which took place during the state's rebuttal to defense character evidence:

> Q:  Without going into the details underlying this, I am going to ask you the following question. Between July of 1987 and October of 1987, did you have occasion to confront the defendant with allegations of sexual contact between him and Autumn?
>
> A:  Yes.
>
> Q:  What was his response at the time?
>
> A:  He denied it, said he wouldn't do anything like that, he was crying so at that time I didn't believe what she said.

Bockting did not object to these questions or request a limiting instruction, and the state trial court did not give such an instruction.

During his "post conviction relief" hearing, Bockting argued that Laura's testimony impermissibly allowed the jury to consider past allegations of sexual assault as evidence that he committed the subsequent sexual assault for which he was convicted. The state trial court and supreme court upheld the evidence's admission, holding that the trial court's decision was consistent with state evidence law. *See* NEV. REV. STAT. 48.045(1) ("Evidence of a person's character or a trait of his character is not admissible for the purpose of proving that he acted in conformity therewith on a particular occasion, except . . . [as] offered by an accused, and similar evidence offered by the prosecution to rebut such evidence . . . ."); *id.* 48.055 ("In all cases in which evidence of character or a trait of character of a person is admissible, proof may be made by testimony as to reputation or in the form of opinion. On cross-examination, inquiry may be made into specific instances of conduct.").

I do not consider at this stage whether the Nevada Supreme Court misinterpreted Nevada law by refusing to grant post-conviction relief based on the trial court's decision to admit Laura's testimony without providing a limiting instruction sua sponte. "Incorrect state court evidentiary rulings cannot serve as a basis for habeas relief unless federal constitutional rights are affected." *Whelchel v. Washington*, 232 F.3d 1197, 1211 (9th Cir. 2000) (internal quotation marks and citation omitted). Thus, my task is limited to deciding whether the evidence's admission violated Bockting's clearly established *federal* rights as defined by the Supreme Court. *See* 28 U.S.C. § 2254(d)(1).

The Supreme Court has never decided whether due process prohibits the admission of prior bad acts evidence, *see Estelle v. McGuire*, 502 U.S. 62, 75 n.5 (1991) (declining to decide whether due process prohibits prior bad acts evidence to show propensity to commit a crime); *Bugh v. Mitchell*, 329 F.3d 496, 512 (6th Cir. 2003), *cert. denied*, 124 S. Ct. 345 (2003) (mem.) ("There is no clearly established Supreme Court pre-

cedent which holds that a state violates due process by permitting propensity evidence in the form of other bad acts evidence."), but it has said that defendants who challenge a state court's admission of relevant evidence on due process grounds "must sustain the usual heavy burden that a due process claim entails: . . . 'it [must] offend[ ] some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental.' " *Montana v. Egelhoff*, 518 U.S. 37, 43 (1996) (plurality), *quoting Patterson v. New York*, 432 U.S. 197, 202 (1977) (internal footnote omitted).

In this case, the admission of Laura's unobjected-to testimony did not meet this "heavy burden" for a valid due process claim. The trial court admitted Laura's testimony during the state's rebuttal case as a response to the testimony of three defense witnesses who testified concerning Bockting's alleged good reputation and character. Laura's rebuttal testimony was relevant to impeach the defense's reputation evidence. The prosecutor touched on Laura's previous allegations only briefly, deliberately skirted the allegations' underlying details to minimize prejudice, and fully disclosed Bockting's vehement denial of the allegations. Moreover, the testimony arguably advanced Bockting's defense by introducing his emotional denial of the previous allegations, as well as Laura's concession that she "didn't believe" the allegations. Given that this evidence came in response to defense character evidence and taking into account the lack of objection, the brevity, and limited scope of the government's questioning relating to Laura's previous confrontation with Bockting, it was not unreasonable for the Nevada Supreme Court to conclude that the admission of this evidence did not transgress a "principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental." *Id.* (internal quotation marks omitted).

### B.

Bockting asserts that the government violated his due process right to a fair trial by vouching for Laura's credibility

during closing argument. *See United States v. Necoechea*, 986 F.2d 1273, 1276 (9th Cir. 1993) ("Vouching consists of placing the prestige of the government behind a witness through personal assurances of the witness's veracity, or suggesting that information not presented to the jury supports the witness's testimony."). As examples of vouching, Bockting cites the prosecutor's statements that Laura "testified as candidly as I think is possible" and "had one motive and it was to tell you the truth." He also faults the prosecutor for characterizing Laura's testimony as "unembellished, . . . straightforward, and . . . candid."

Even if these statements arguably constituted "vouching," Bockting does not qualify for habeas relief under AEDPA's deferential standard if the Nevada Supreme Court's failure to grant post-conviction relief on this basis was neither "contrary to," nor "involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). According to the Supreme Court, "[t]he relevant question" in evaluating a prosecutorial vouching claim "is whether the prosecutors' comments so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Darden v. Wainwright*, 477 U.S. 168, 181 (1986).

Several factors work to Bockting's disadvantage here. First, the prosecutor did not ask the jury to accept Laura's credibility based on his endorsement alone; rather, he explained that "[t]he *evidence* shows that [Laura] was candid" (emphasis added), and he identified several specific instances where Laura made no attempt to conceal facts damaging to Autumn's allegations (e.g., Autumn observing her parents engaged in sexual relations) or to her own reputation and credibility as a government witness (e.g., her drug and alcohol problems, her occupation as a nude dancer). *See Necoechea*, 986 F.2d at 1276 (recognizing "that prosecutors must have reasonable latitude to fashion closing arguments, and thus can argue reasonable inferences based on the evidence, including

that one of the two sides is lying"). Second, the trial court significantly diminished the risk of prejudice by instructing the jury that "[s]tatements, arguments and opinions of counsel are not evidence in the case." As in *Davis v. Woodford*, 333 F.3d 982 (9th Cir. 2003), "[t]his was not a case in which there was an 'overwhelming probability that the jury [would] be unable to follow the court's instructions' and 'a strong likelihood that the effect of the [vouching] would be devastating to the defendant,' " *id.* at 997 (second alteration in original), *quoting Greer v. Miller*, 483 U.S. 756, 766 n.8 (1987). Third and perhaps most important, the prosecutor's statements did not render the trial fundamentally unfair because the record confirmed Laura's testimony, including: testimony by Doctor Rivers (who conducted Autumn's rape examination) that Autumn had suffered penetration injuries to her vagina and rectum during the previous week, Bockting's admission that he was the only adult male who was alone with Autumn during the week when she sustained her injuries, and Detective Zinovitch's testimony substantially corroborating Laura's description of Bockting's sexual assault. In sum, under the circumstances of this case, Bockting has not demonstrated that the Nevada Supreme Court applied the principle in *Darden* unreasonably by holding that the prosecutor's vouching did not "so infect[ ] the trial with unfairness as to make the resulting conviction a denial of due process." *Davis*, 333 F.3d at 996-97, *quoting Darden*, 477 U.S. at 181.

## C.

Lastly, I consider Bockting's assertion that his representation at trial was constitutionally deficient. The Supreme Court has held that a claimant "must show that counsel's performance was deficient" and that such "performance prejudiced the defense" to prevail on a Sixth Amendment ineffective assistance of counsel claim. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). To establish prejudice, a claimant must demonstrate "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have

been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694. The question to be answered is whether the Nevada Supreme Court's denial of post-conviction relief was "contrary to, or involved an unreasonable application of," these principles. 28 U.S.C. § 2254(d)(1).

I confine my ineffective assistance analysis to the three issues addressed in our October 16, 2002 order granting Bockting's first motion to broaden the Certificate of Appealability (COA): (1) trial counsel's failure to object to inadmissible hearsay evidence at trial, (2) trial counsel's failure to object to repeated instances of prosecutorial vouching, and (3) appellate counsel's failure to research adequately and present these appealable issues to the Nevada Supreme Court. Bockting's second motion to broaden the COA, which is currently before this court, raises a fourth ineffective assistance of counsel issue: his "trial counsel's failure to conduct any investigation of the facts which would undermine the reliability of the child's hearsay statements." The second motion for broader certification was filed on June 17, 2003—more than a year after the district court declined to certify Bockting's ineffective assistance of counsel claim and eight months after we granted his first motion to broaden the COA. Pursuant to Circuit Rule 22-1(d), Bockting should have raised any and all grievances relating to the COA's scope "within thirty-five days of the district court's entry of its order denying[, in part, his] certificate of appealability." 9TH CIR. R. 22-1(d). His "[f]ailure to comply with the Circuit Rule's procedure is a ground for denying" the second motion, "which [I would] do here." *Griffin v. Johnson*, 350 F.3d 956, 960 (9th Cir. 2003).

With respect to the remaining Sixth Amendment claims, the Nevada Supreme Court invoked *Strickland*'s standard and held that Bockting "has not demonstrated that counsel's performance was unreasonable, or that counsel's errors were so severe that they rendered the jury's verdict unreliable." I need not consider the first part of this holding, because the record

as a whole does not support Bockting's claim that the state supreme court unreasonably applied *Strickland*'s prejudice inquiry. *Cf. Kennedy v. Lockyer*, 379 F.3d 1041, 1053 (9th Cir. 2004) (observing that "[i]n making a harmless error determination in a habeas case," federal courts have "an obligation" to consult the full record), *quoting O'Neal v. McAninch*, 513 U.S. 432, 435 (1995).

Bockting faults his trial counsel for failing to object to the government's prior bad acts evidence, but he has not demonstrated that he suffered any prejudice from his counsel's allegedly deficient performance. A timely objection by Bockting's counsel likely would have been futile, because Laura's testimony was admissible under state law. In addition, even setting aside Laura's testimony concerning Bockting's prior bad acts evidence, the evidence against Bockting was overwhelming. Similar logic dooms Bockting's other arguments. His trial counsel's failure to register a timely objection to the prosecutorial vouching did not clearly prejudice his defense, because the trial court gave a cautionary instruction and there was overwhelming evidence corroborating Laura's testimony.

In sum, Bockting has not shown that the Nevada Supreme Court applied *Strickland* unreasonably to the facts of this case by holding that his "counsel's errors were [not] so serious as to deprive [him] of a fair trial, a trial whose result is reliable." *Strickland*, 466 U.S. at 687. I would therefore hold that we lack authority under AEDPA to grant Bockting's petition for habeas relief on this ineffective assistance of counsel claim.

For the foregoing reasons, I would affirm the district court's denial of Bockting's petition for habeas corpus. I therefore respectfully dissent.